Francoise J. DAVILA, Appellant,

v.

Stephen J. DAVILA, Appellee.

No. S–6654.

Supreme Court of Alaska.

Dec. 29, 1995.

---

A. René Broker, Cook, Schuhmann & Groseclose, Inc., Fairbanks, for Appellant.

Patrick T. Brown, Law Offices of Patrick T. Brown, Fairbanks, for Appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal arises out of a divorce proceeding in which the only contested issue was the property division. On appeal, Fran Davila challenges the adequacy of the superior court's findings and argues that the superior court mischaracterized certain stocks as marital property. She also contends that the superior court failed to adequately provide for her support through the property division and therefore should have granted her spousal support or an award of attorney's fees or both.

## I. FACTS & PROCEEDINGS

Stephen (Steve) and Francoise (Fran) Davila were married on April 16, 1977. During their marriage, they had one child, Christina, born on October 19, 1977. The parties separated after sixteen years of marriage on August 1, 1993. At the time of trial, both Steve and Fran were 37 years old.

The parties were able to agree on all issues pertaining to their child Christina, including their respective support obligations. They agreed to share physical and legal custody of Christina, who will spend alternating months living at each parent's home until she graduates from high school. Pursuant to Civil Rule 90.3, Steve is required to pay $397.38 per month for child support. Additionally, so long as it is available through the benefits he receives from the military, Steve will continue to provide Christina's health insurance.

Steve has been in the Air Force since shortly after the parties were married. He intends to retire on June 1, 1997, when he completes 20 years of service. At the time of trial, he was a Technical Sergeant specializing in munitions systems and had a rank of E-6. He had been selected for promotion to a rank of E-7, but had not yet been promoted. Steve has an associate's degree in munitions systems technology from the Community College of the Air Force. He is currently working on a bachelor's degree in business administration, which he plans to have com-

pleted by the time he retires. Steve has also obtained an Alaska Assistant Guide License.[1]

From his job in the military, Steve earns the following monthly pay:

| BASE PAY | Base Pay: | $1,857 |
|---|---|---|
| | COLA: | $ 338 |
| | Rations: | $ 206 |
| | | |
| | TOTAL/MONTH | $2,401 |
| | | |
| HOUSING | Quarters Pay: | $ 314 |
| | Housing Allowance: | $ 186 [2] |
| | | |
| | TOTAL/MONTH | $ 500 |

Thus, Steve earns approximately $28,812 per year from his job in the Air Force, plus $6,000 for housing. Both the COLA and the amounts for housing are non-taxable. When he is promoted, Steve will receive a pay raise of approximately $250 per month. Before the separation Steve held a second job as a cashier and pump attendant, from which he earned $4,042. He quit this second job in July 1993, the same month he filed his complaint for the divorce.

Fran obtained her GED in 1987, but has no post-secondary education except for a six-month computer training course. She has been employed intermittently throughout her marriage in various part- and full-time positions. She has worked as a waitress, swimming instructor, and most recently as a medical secretary.

Extensive testimony was received at trial regarding Fran's medical condition. In February 1991, Fran tripped over a chain and broke the metatarsals in her left foot. The injury developed into a condition called reflex sympathetic dystrophy syndrome (RSD). The symptoms of RSD are swelling, chronic pain, tightness of the skin, and a general inability to use the extremity in a normal fashion. Additionally, Fran suffers from depression which is often associated with RSD.

Her treating physician testified that her ability to work would be affected by RSD because of

> the problem that her foot causes for her ambulating ability, for her ability to be on her feet for a period of time to engage in any kind of employment activity which requires that she be up on her feet or even be sitting at a desk there with her foot dependent, which also would cause it to swell.

She was terminated from her most recent job as a medical secretary when she was hospitalized in April 1994.

Fran has been hospitalized three times as a result of this condition: (1) from January 5, 1993, to July 31, 1993, except for two weeks; (2) in December 1993 for approximately two weeks; (3) in April and May 1994 at the University of Washington Pain Clinic. At the time of trial, Fran was undergoing daily physical therapy, was on various medications, and was seeing a psychotherapist.

Besides affecting her ability to work, Fran's condition has numerous economic consequences for her which affect the divorce proceeding. First, the cost of the various medications which she takes is approximately $400 per month. Second, because her hospitalization at the University of Washington occurred after the Davilas separated, she is solely liable for the roughly $9,500 in hospital bills which her insurance did not cover.[3] Finally, her existing insurance which she receives through Steve's employment will be terminated as a result of the divorce. Because of her pre-existing condition, she is unable to obtain private health insurance. Thus, her only option is to enter Alaska's high-risk pool. The premium in this pool is $306 per month, and there is a $500 annual

---

**1.** After three seasons as either an unclassified or Class–A assistant, the licensee may obtain a guide-outfitter license allowing the holder to contract to guide-outfit big game hunts. AS 08.54.350(c).

**2.** According to Steve's testimony, the Housing Allowance fluctuates based on the actual expenses of the recipient, up to a capped amount. The $186 as estimated by Fran in her brief is based on testimony by Steve that his actual expenses are approximately $450–500.

**3.** Until the date the divorce was finalized, Fran was covered by Steve's medical insurance which he received from the Air Force. The military insurance covers 100% of treatments given at a military hospital, but only 80% of all reasonable expenses incurred at a civilian hospital. Fran's bill for the seven-week in-patient stay was approximately $47,000.

deductible and a 20% co-payment on the first $10,000 of coverage.

Following a three-day bench trial, the superior court entered oral findings and thereafter written findings of fact and conclusions of law. The court determined that Fran was entitled to $78,009 in non-marital property, and 53% or $54,674 of the marital estate. Steve's total award including both marital and non-marital property was $52,732. Fran was also awarded a pro rata share of Steve's pension when he retires from the military. Additionally, the court denied Fran's request for rehabilitative and reorientation alimony, concluding that the availability of non-marital assets and the award of more liquid marital assets were sufficient to meet her needs. Fran then moved for reconsideration and for attorney's fees. The trial court denied both motions. Fran now appeals.

## II. STANDARD OF REVIEW

■ A three-step process is used in Alaska to divide marital assets. First, the court determines what specific property is available for distribution. Second, the court values that property. Finally, the court equitably allocates it between the parties. *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983). The court makes this allocation based on the criteria in AS 25.24.160(a)(4).

■ Fran challenges the superior court's rulings with regard to steps one and three of this analysis. As to the first step, we review a trial court's determination of whether particular assets are marital or separate property for an abuse of discretion. *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991). "[T]he trial court's findings that the parties intended to treat property as marital are disturbed only if clearly erroneous." *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994) (citation omitted). Regarding the third analytic step, a trial court has broad discretion in fashioning a property division which will not be disturbed unless it is clearly unjust. *Laing v. Laing*, 741 P.2d 649, 651 (Alaska 1987) (citations omitted).

■ Finally, Fran challenges the superior court's decision not to award her some type of spousal maintenance or attorney's fees. We review both of these decisions for an abuse of discretion. *Johnson v. Johnson*, 836 P.2d 930, 933 (Alaska 1992).

## III. DISCUSSION

### A. Dean Witter Stock

■ At the time Fran and Steve separated, they had an investment account with Dean Witter which contained stocks worth approximately $23,700. The money used to purchase these stocks originated from the estate of Fran's mother who died in 1988. According to her mother's written will, Jim Carey (Jim), Fran's brother, was to receive a majority of the property in the estate. However, Jim testified that after the will was written his mother requested that the property be divided equally between Fran and himself. In accordance with these wishes, after the estate had been distributed, he decided to transfer some of the property he had received to Fran. To avoid federal gift taxes, Jim sent separate checks of $10,000 to Fran, $10,000 to Steve, and $3,500 to Christina. The money was first placed in separate individual accounts. It was eventually combined into a joint account with Dean Witter, bearing both Fran's and Steve's names, and stocks were purchased. It is the ownership of these stocks which is now at issue.

In its oral findings, the superior court held that the stocks were marital property. It based this conclusion on the fact that the stock was purchased from a joint account, that the money used to purchase the stocks was initially given to Fran and Steve as individuals, and because it was Steve who was primarily responsible for managing the investment account.

The superior court's determination that the parties intended to treat the stock as a marital asset was not clearly erroneous, and therefore the decision that it was available for distribution was not an abuse of discretion. We agree with Fran that none of the factors discussed by the superior court mandate a finding that the stock was treated as marital property by the parties. However, viewing the factors cumulatively, it was not

unreasonable for the superior court to reach such a conclusion.

In *Julsen v. Julsen,* 741 P.2d 642, 646–47 (Alaska 1987), we noted that the fact that stocks inherited by one of the parties during the marriage were held in a joint account was not dispositive in determining whether they were marital property. Nonetheless, the fact that property is held jointly may be used as evidence of intent. Similarly, we stated in *McDaniel v. McDaniel,* 829 P.2d 303, 306 (Alaska 1992), that "[p]articipation ... in the management and maintenance of ... property will not automatically transform pre-marital into marital property. Rather, the participation must be significant and evidence an intent to operate jointly." In this case, although the number of stock transactions was small,[4] the superior court could have considered evidence that Steve managed the stock account as tending to show the parties' intent.[5] Further, the superior court relied on the fact that $10,000 was initially given to Steve individually. Fran and Jim testified that their intent was solely to gain a tax advantage. However, such an intent is not inconsistent with joint ownership—because neither Jim nor Fran foresaw divorce, both may have viewed the gift to Steve as a way to gain the tax benefit while benefitting Fran by giving a gift to the Davilas as a couple. Therefore we hold that in light of the various indicia of joint ownership the superior court's finding that the Davilas treated the stock in the Dean Witter account as a marital asset is not clearly erroneous.

## B. *The Adequacy of the Superior Court's Findings*

 Alaska Statute 25.24.160(a)(4) lists nine factors which the trial court must consider in dividing marital and non-marital property. In making its property division, the trial court is required to "articulate sufficiently specific factual findings to indicate the

basis for the division." *Lang v. Lang,* 741 P.2d 1193, 1195 (Alaska 1987). One of the primary functions of this requirement is to allow this court to engage in a meaningful review and thus assure that the trial court has considered the appropriate factors. *See Merrill v. Merrill,* 368 P.2d 546, 547–48 (Alaska 1962). Thus, the trial court need not make findings as to every factor, nor do these findings need to be exhaustive, but where the parties raise significant issues regarding particular factors, the trial court must address these issues in its findings. *Brooks v. Brooks,* 677 P.2d 1230, 1233 (Alaska 1984).

The superior court's division of the property was guided by its consideration of a number of factors. First, the court concluded that Fran's medical condition was not so severe that she would be unable to work. Second, the court found that once she was able to work her earning potential would be greater than Steve's. And finally, the court noted that its relatively large award of separate property made a significantly unequal property division unnecessary. We conclude that the superior court's findings addressed the salient issues raised at trial, and are supported by the record. Additionally, based on these findings, we cannot say that the property division is clearly unjust.

 Addressing the particular issues raised by Fran, the superior court adequately considered the source of the assets in determining whether particular assets were marital or separate property. Additionally, the written findings clearly discuss the fact that numerous assets originated with Fran's inheritance from her mother but were treated as marital property. In light of the fact that most of the property which Fran inherited was classified as separate property and awarded to Fran, we conclude that these findings were sufficient.

---

**4.** According to Steve's testimony, three stocks were purchased when the account was initially established. These stocks were later sold and the proceeds were used to purchase the stocks currently in the account.

**5.** Significantly, in *Julsen,* we relied on the fact that the non-donee spouse did not participate in

management decisions regarding the stock account to show that the parties intended that the stock would remain separate property. 741 P.2d at 646–47. Implicit in this reasoning is that the non-donee spouse's management of the account would have been evidence that the parties intended joint ownership.

With respect to Fran's health, the superior court discussed, in its written findings, her primary problem—RSD. The superior court also concluded in its oral findings that RSD would probably not prevent Fran from going back to work and that the stress-related component of RSD would probably diminish as a result of the conclusion of divorce proceedings. Thus, the superior court considered the primary economic impact of Fran's condition, and, as discussed in greater detail in the next section, the court's view that Fran would be able to work around the condition finds support in the record.

■ The court relied primarily on the testimony of Fran's own expert to determine her future earning capacity.[6] If one credits her expert, which the trial court was entitled to do, the record supports the finding that her earning capacity will be at least comparable to Steve's.

■ With respect to Fran's present financial condition, the superior court made no specific findings as to her post-separation medical debts or the costs of health insurance[7] and her rehabilitation program. However, the court did make a general finding that the large separate property award was sufficient to meet her rehabilitation expenses and her "special needs." Our review of this issue leads us to conclude that Fran was awarded sufficient assets to satisfy all of her present liabilities, finance her rehabilitation program, and meet her future living expenses (including the cost of medical insurance) during the rehabilitation period.[8]

We conclude that the superior court's findings address the main issues raised by the parties below in a manner sufficient to permit adequate review. In light of Fran's failure to demonstrate that her needs have not been met as a result of this distribution, and our conclusion in the following section that as a result of the rehabilitation program which she proposes she will have adequate financial resources, we conclude that the property distribution is not clearly unjust.

### C. Spousal Support and Attorney's Fees

■ Fran's final argument on appeal is that the superior court's total property award to her is inadequate to meet her existing medical bills, attorney's fees, future medical expenses, and reorientation and rehabilitative needs. Therefore she contends that the trial court erred in not awarding spousal support[9] or attorney's fees and costs.

At trial, Fran called Dr. Vincent Gollogly as an expert witness. Dr. Gollogly is a vocational rehabilitation counselor and psychologist. He met with Fran, performed various aptitude and intelligence tests, reviewed her medical records, and spoke with a representative from the University of Washington Pain Clinic who had previously worked with Fran while she was hospitalized there. Taking into account such factors as Fran's physical limitations, the job market, Fran's economic needs, and her various aptitudes, Dr. Gollogly recommended that Fran pursue a career as a dental hygienist. Dr. Gollogly recommended that Fran spend one year in Fairbanks taking two prerequisite courses at UAF (chemistry and biology) and then enter a two-year program at West Liberty College in West Virginia. Upon completion of the program, she would be able to earn approximately $30/hour and would be able to obtain a job with relatively flexible scheduling. Dr.

6. The court also stated in its findings that Fran had worked outside the home at various times during the marriage.

7. The record reveals that the superior court was cognizant of the health insurance issue and found that Fran should bear the contingent liability should she need medical care during the six months she is without health insurance.

8. See Section III.C *infra* for a full discussion of this issue.

9. There are two distinct types of continuing spousal support. "[R]ehabilitative alimony is properly limited to job training or other means directly related to the end of securing for one party a source of earned income." *Schanck v. Schanck,* 717 P.2d 1, 5 (Alaska 1986). Reorientation alimony, on the other hand, is meant to "allow the requesting spouse an opportunity to adjust to the changed financial circumstances accompanying a divorce." *Richmond v. Richmond,* 779 P.2d 1211, 1215 n. 6 (Alaska 1989). For example, reorientation alimony is appropriate to allow the recipient spouses time to reorganize their assets into a more liquid form, or to find jobs commensurate with skills which they already possess.

Gollogly testified that working part time would enable Fran to earn $30,000 per year, and that if she was able to work full time she could earn as much as $60,000 per year. At trial, Fran expressed a desire to pursue a career as a dental hygienist as recommended by Dr. Gollogly.

In its oral findings the superior court explained its decision not to award spousal support as follows:

> Now, the total non-marital property before pension considerations awarded—I mean total non-marital property awarded to Ms. Davila here is $78,009.31. This separate property is important to the Court in its determination of the claim of spousal support and special needs. This Court concludes that Ms. Davila, if she completes the two years of study required for dental hygienist certification, will far surpass Mr. Davila in earning ability, capable of earning a salary in Fairbanks, Alaska, of $60,-000 annually. Ms. Davila worked full-time before. I believe she'll work full-time again.... The availability of these significant non-marital funds caused the Court to make a closer than balanced distribution than otherwise would have been given, although as I've stressed, there is a tilting of the liquid items to her and a distribution tilt in her favor nonetheless.

The court made no specific findings with respect to its order denying attorney's fees.

From the trial testimony it appears that Fran has sufficient assets to cover all of her expenses over the next three years, as well as her current liabilities. Fran details these expenses as follows:

| | |
|---|---|
| Health Insurance ($306 per month) | $ 11,016 |
| Outstanding Hospital Bill | $ 9,400 |
| Attorney's Fees and Costs | $ 29,420 |
| Rehabilitation Costs [10] | $ 48,000 |
| Prescriptions [11] | $ 2,400 |
| TOTAL | $100,236 |

■■■ This amount does not include two items mentioned by Fran. First, the court allocated to Fran 75% of the capital gains tax payable on any profit made on the sale of the Davilas' home. However, this amount is relatively small as the total profit on the house after expenses was roughly $1,000. Thus Fran has a one time tax expense on a capital gain of approximately $750. The only other possible expense mentioned is any medical expense (other than prescription drugs) incurred during the self-insurance period. The trial court dealt with this issue by stating that Fran could minimize expenses during this period by only receiving necessary treatments.[12]

Based on the superior court's distribution of property, Fran received $132,683 in assets, including more than $110,000 in cash and securities. This does not include (1) any return on these investments, (2) any social security or vocational rehabilitation benefits to which she might be entitled,[13] (3) any income she might receive if able to work, or (4) her share of Steve's pension benefits, which will begin in June 1997.[14] Thus, based on the rehabilitation scenario which Fran presented at trial, she has received sufficient assets to complete the three year program

**10.** This figure includes Dr. Gollogly's estimate that attendance at West Liberty College (including living expenses and airfare) would cost $35,-540.

**11.** This amount represents the $400 per month cost of Fran's prescription medicines multiplied by six months while she has no insurance. Once she enters the high risk insurance pool, her prescriptions will be covered.

**12.** On its face the superior court's decision to assign this contingent liability to Fran in light of her past frequent hospitalization might seem inequitable. However, in light of Fran's ability to control expenses by seeking only necessary treatment, and the nature of her ailment—Fran's most recent hospitalization was at a pain clinic

and, however real, her ailment threatened neither life nor limb—we conclude that it was not an abuse of discretion to assign this liability to Fran alone.

**13.** A CPA who testified for Fran stated that Fran might qualify for supplemental social security income. Dr. Gollogly testified that Fran "would have a good chance of obtaining" vocational rehabilitation services through the State which would pay some or all of her tuition.

**14.** Fran will receive 40.425% of Steve's pension if he retires in June 1997. Steve's pension is based on 50% of his base salary at retirement, which, assuming he is promoted, will be at least $2,350 per month. At this salary level, Fran would receive roughly $475 per month.

necessary to become a dental hygienist without having to liquidate any of her other assets.[15]

Fran has failed to demonstrate that her share of the property division is inadequate to fulfill her rehabilitation plan.[16] The superior court found, based on the evidence, that Fran would likely be able to work again. There is ample evidence in the record to support this conclusion. For example, Fran's treating physician testified that one of the "mainstays of treatment" for RSD is for the patient to force herself to use the foot.[17] Additionally, Fran's own expert rehabilitation specialist stated that he chose the program with Fran's medical condition in mind. Because the property settlement was sufficient to fund a three year rehabilitation program designed by her own expert witness, we conclude that the decision not to award spousal support was not an abuse of discretion.

The same reasoning supports a denial of attorney's fees. The sole purpose in awarding attorney's fees in divorce actions is to "enable the other spouse to prosecute or defend the action[.]" AS 25.24.140. Thus, even if Steve earns more than Fran, if her resources are sufficient for the superior court to reasonably expect her to pay her own fees, it is not an abuse of discretion to require her to do so. *See H.P.A. v. S.C.A.*, 704 P.2d 205, 212 (Alaska 1985). Because of the large property settlement, Fran had sufficient resources in the present case.

## IV. *CONCLUSION*

Based on the foregoing, we AFFIRM the superior court's property distribution, as well as its decisions to deny attorney's fees and spousal support.

**15.** According to our calculation, Fran would have approximately $10,000 in liquid assets to spare. Thus, even assuming she had already used $7,400 in CD proceeds to cover expenses before trial, she would still have sufficient resources.

**16.** This court's decisions have established a preference for meeting the parties' needs with the division of property, rather than with alimony, where the marital assets are adequate to do so. *Bussell v. Bussell,* 623 P.2d 1221, 1224 (Alaska 1981); *Malone v. Malone,* 587 P.2d 1167, 1168 (Alaska 1978).

**17.** The physician testified at another point, "The usual course of treatment for this problem has to do with encouraging the individual to use the extremity and trying to provide as much pain relief by whatever method seems to be workable." Additionally, her rehabilitation specialist testified "I still think that she should be able to do work, yes, and that's the hope."