Jeffrey J. BERG, Appellant,

v.

Shannon L. BERG, Appellee.

No. S–8284.

Supreme Court of Alaska.

July 30, 1999.

Chrystal Sommers Brand, Baxter, Bruce, Brand & Douglas, Juneau, for Appellant.

Mary E. Guss, Ketchikan, for Appellee.

Before: MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

Jeffrey Berg appeals the superior court's valuation of several remaining items of real and personal property after Jeffrey's divorce from Shannon (Berg) Vandervest. We affirm the trial court's valuation and distribution of all of the parties' assets.

## II. FACTS AND PROCEEDINGS

Jeffrey (Jeff) and Shannon Berg petitioned for dissolution of their ten-year marriage in March 1995. The dissolution was granted effective April 26, 1995. At the time of disso-lution, Jeff and Shannon decided to retain joint ownership and shared use of several pieces of real and personal property and to continue to manage their commercial assets in a fishing partnership.

In particular, the parties chose to reserve a portion of their real property—two adjacent parcels of waterfront land in Papkes Landing in Petersburg—to use jointly. This land consists of two parcels: Lot 13 contains 2.97 acres, and Lot 14 contains 5.47 acres. The parties agreed that Jeff would take Lot 13, the northernmost part of the property, and that Shannon would take an equivalently sized portion on the south end of the property. But the parties explained that "[t]he middle 2.5 acres which include storage, mill, garden, & house [are] to be mutual property." Lot 14 was not actually subdivided and the parties presented conflicting evidence as to whether they intended that it be formally divided.

Soon after the dissolution was granted, Jeff and Shannon began having problems maintaining cooperative and amicable ownership and use of the jointly held items. They again came before the superior court for valuation and distribution of the assets they held jointly. Judge Thomas M. Jahnke held trial in Petersburg on April 16, 1997. Jeff and Shannon stipulated to the value and distribution of many of the disputed items before trial; the trial court focused largely on the valuation of the Papkes Landing property. Jeff and Shannon each presented widely divergent appraisal values of the property. Additionally, the court heard testimony about the value of Jeff and Shannon's jointly owned salvage business, Katrina Ann, Inc., and a variety of items of personal property, including the fishing vessel JANE B (F/V JANE B), a 1983 Chevrolet Suburban, and a set of black cod pots.

The superior court issued its Memorandum of Decision and Order on July 17, 1997. After a lengthy discussion of the merits of the differing appraisals that had been conducted on the property, the court valued Lot 14 at $85,000 and awarded it in its entirety to Shannon. Jeff moved for reconsideration of

the court's decision regarding several items; his motion was denied. Jeff appeals.

### III. STANDARD OF REVIEW

■■■ Trial courts exercise broad discretion in the division of marital assets.[1] Division of property upon divorce is a three-step process. First, the court must determine what property is marital and thus available for division.[2] We review the court's characterization of property as marital or separate for an abuse of discretion.[3] Second, the court places a monetary value on the marital property.[4] We review valuation issues under the clearly erroneous standard, reversing only if we are left with a "definite and firm conviction that a mistake has been made."[5] Third, the court equitably distributes the marital property.[6] We review this step for abuse of discretion and will affirm unless the trial court's decision is clearly unjust.[7]

### IV. DISCUSSION

Jeff maintains that the trial court "undervalued items of property that were awarded to Shannon[ ] and overvalued items of property that were awarded to Jeff," with a resulting inequitable division of the property between the parties. Jeff specifically challenges the valuations of several items: the Papkes Landing property, the F/V JANE B, the couple's business venture Katrina Ann, Inc., Shannon's Suburban, and the black cod pots. He also appeals the court's award of Katrina Ann, Inc. to him.

1. See Johns v. Johns, 945 P.2d 1222, 1224 (Alaska 1997).

2. See Brotherton v. Brotherton, 941 P.2d 1241, 1243 (Alaska 1997).

3. See id.

4. See id. at 1244.

5. Davila v. Davila, 876 P.2d 1089, 1092 (Alaska 1994); see also Brotherton, 941 P.2d at 1244; Musser v. Johnson, 914 P.2d 1241, 1242 (Alaska 1996).

6. See Brotherton, 941 P.2d at 1243.

7. See Cox v. Cox, 882 P.2d 909, 914 (Alaska 1994).

### A. Valuation of the Papkes Landing Property

Jeff first argues that the court's valuation of Lot 14 at $85,000 was clearly erroneous and that the court committed legal error when it relied on a 1996 appraisal that Jeff believes was a "low-ball appraisal" rather than accepting a 1997 appraisal that yielded a significantly higher value. We disagree.

The first appraisal report on the Papkes Landing property, prepared by Gaylord Orsborn of the firm of Thomas P. King and Associates, was released February 1996. Orsborn inspected the property, took photographs, and conducted comparative analysis between the Berg property and similar sales of waterfront real estate in the Petersburg market. He estimated the value of the land using a price-per-acre measure of $10,000 per acre, adjusting for the condition of the Bergs' property and sales prices of comparable lots. Orsborn valued Lot 14 at $85,000. He noted that the property's value would increase if Lot 14 were divided into two separate lots.

At Jeff's request, the King firm performed another appraisal of Lot 14 in December 1996; this time Thomas King prepared the appraisal. Jeff asked King to appraise the land's value if it were subdivided into three separate parcels—Lots 14A, 14B, and 14C. The subdivision corresponded to the agreement for sharing the land contemplated in Jeff and Shannon's dissolution agreement: Lot 14C comprised the southern tip of the property and measured 2.97 acres, while Lots 14A and 14B were split equally into two 1.25 acre parcels.[8] Unlike Orsborn, King did

8. Jeff testified that he believed dividing the property in this way would be most fair, because it would enable both Jeff and Shannon to keep a precisely equal portion of the Papkes Landing property. He also stated that he believed this understanding was shared by Shannon and reflected in the dissolution agreement's statements regarding "the middle 2.5 acres." Shannon, however, testified that she never intended to subdivide Lot 14 and that she did not wish to do so. Her view of the dissolution agreement was that it merely reflected the informal boundaries at the time when the couple believed they could jointly use the middle section of the property. In any case, Jeff conceded at trial that it would be "easier" simply to award Lot 14 in its entirety to Shannon and that such an approach would be a reasonable way to "try and attain a fair resolution in the case."

not take into account actual improvements on the land. And King valued the lots based on the amount of waterfront acreage—a "per-front-foot of beachfront" measure instead of a price-per-acre measure. Thus, the King appraisal employed methodology significantly different from that of Orsborn's appraisal.

King's appraisal of the hypothetically divided Lot 14 produced dramatically different land values than the Orsborn appraisal had. King concluded that the entire parcel, undivided, was worth $107,100. He also appraised the values of the divided parcel, valuing Lots 14A and 14B at $50,000 each and Lot 14C at $110,000, for a total of $210,000. King stated that the only reason for the significant difference in the two appraisals was the differing valuation methods used.

▮▮ After considering these widely divergent appraisal values for Lot 14, the superior court concluded that the Orsborn assessment was more sound. To support its conclusion, the court noted several flaws in King's appraisal. First, the court observed that Orsborn thoroughly compared the Berg property to similar nearby parcels, while King's analysis in this area was much weaker. Second, the court criticized King's "per frontage foot" measure as lacking a reliable foundation in the Petersburg land market because King did not explain how he arrived at the value per frontage foot. Third, the court did not find it reasonable that King's assessment valued Lot 14C alone as being worth more than all of Lot 14 together. Fourth, the court was skeptical that the selling price of the Berg land could have increased so dramatically in less than a year and found King's assessment inconsistent with real estate sale prices of comparable parcels in the Petersburg area. Finally, the court pointed out that King admitted that his estimates did not include the costs that subdividing Lot 14 would create, including the need to build a road

to ensure access to each parcel. These criticisms of the King appraisal are all reasonable and supported by the record. Accordingly, we conclude that the court's decision to rely on the Orsborn assessment rather than the King assessment was not clearly erroneous.

Jeff also argues that the court committed legal error because it discounted the findings in the most recent appraisal. In support of his position, Jeff cites a line of Alaska cases in which this court has held that marital property should be valued as close to the time of trial as possible. For example, in *Ogard v. Ogard*,[9] we explained that the valuation date for marital property should normally be "as close as practicable to the date of trial" in order to "provide the most current and accurate information possible and [to] avoid[ ] inequitable results."[10] Jeff relies on this language in arguing that the court erred when it based its valuation of the Papkes Landing property on the Orsborn appraisal rather than the King appraisal since the King appraisal was performed most recently and closer to the trial date. Jeff's reliance on these cases is misplaced.

The cases Jeff cites dealt with the question of whether the court should determine marital property values as of the date of separation or the date of trial. We have held that the proper inquiry is normally the value of the property as of the time of trial rather than the date of separation.[11] But here, Judge Jahnke did conduct the valuation inquiry on the basis of the property's worth at the time of trial.[12] It is true that, in doing so, he accepted an appraisal value other than the most recent one. But nothing in the cited cases supports the idea that the court must automatically accept the most recent estimate of an item's value. Indeed, the last-in-time rule urged by Jeff would be unwise from a policy perspective: Rather than asking, as the superior court did here, which

9.   808 P.2d 815 (Alaska 1991).

10.  *Id.* at 819 (citations and internal quotation marks omitted); *see also Cox,* 882 P.2d at 917.

11.  *See Ogard,* 808 P.2d at 819; *Cox,* 882 P.2d at 917–18.

12.  There is no express finding as to the date of valuation. But the court heard extensive testimony about the value of all the disputed property items at the trial. And in its judgment, the court noted that the King appraisal was more recent but chose to discount its conclusions because of perceived flaws in King's methodology.

appraiser used the better methods and depended upon the most reliable information, the superior court would be required to accept the most recent appraisal no matter how it was obtained. The *Ogard* line of cases does not support this interpretation.

### B. *Valuation of the F/V JANE B*

■ Jeff also disputes the court's valuation of the F/V JANE B. First, he challenges the court's rejection of the figure contained in the dissolution petition. In the alternative, he argues that the trial court should have accepted his testimony that the vessel was worth $15,000 rather than Shannon's testimony that its value was $10,000. These arguments are meritless.

The court had three conflicting pieces of evidence before it regarding the value of the vessel. In their dissolution agreement, Jeff and Shannon stipulated that it was worth $20,000. At trial, both parties revised their estimates: Jeff testified that the vessel was worth $15,000 and Shannon that it was worth $10,000. The court ultimately valued this asset at $10,000 and awarded it to Shannon.

Jeff maintains that the court should have accepted the previously stipulated value of the F/V JANE B as $20,000. But both Jeff and Shannon approached the court for valuation and distribution of all the assets jointly held in the dissolution decree. And since neither party believed $20,000 was a fair value at the time of trial, it would make little sense to require the court to accept that value.

Jeff alternatively claims that the court should have accepted his testimony over Shannon's. The only evidence presented at trial of F/V JANE B's value was the testimony of the parties. Jeff testified that the boat was purchased for $20,000, that the couple had added improvements, and that he believed the vessel was now worth $15,000. Shannon testified that the boat was purchased for $14,000, had not been used in a decade, was in poor condition, and was worth only $10,000. Because it is within the prov-

ince of the trial court to make factual determinations based on witness credibility,[13] Jeff has failed to show that the trial court's valuation of the F/V JANE B was clearly erroneous.

### C. *Valuation and Distribution of Katrina Ann, Inc.*

■ Jeff also appeals the valuation and distribution of a partnership that he and Shannon jointly owned during their marriage. Katrina Ann, Inc. was a salvage venture initiated by Jeff and Shannon to purchase a sunken boat and some salvage equipment. By the time of trial, the business was "essentially defunct." Jeff testified that the corporation was valueless and might even be "more of a liability than an asset" because of the possibility that the boat could injure someone or begin to leak oil. But he also testified that the business owned a gear locker, float bags, and other miscellaneous gear with a value he estimated to be $5,000. Jeff stated that he could see no reason why he could not sell the float bags and miscellaneous gear. Thus, the only testimony before the court established that the business had assets of $5,000 that could be liquidated. The superior court committed no error in valuing Katrina Ann, Inc. at $5,000.

■ Jeff also appeals the court's distribution of Katrina Ann, Inc. to him. But Jeff testified at trial that he did not care which party received Katrina Ann, Inc. His distribution argument is actually a restatement of his contention that Katrina Ann, Inc. was improperly valued: He argues that "[t]he court should have awarded the Katrina Ann, Inc. to either Shannon or Jeff, but at a zero value. Instead, the Court valued [Katrina Ann, Inc.] at $5,000.00 [and] made Jeff take it at that inflated value." Accordingly, this argument must fail for the same reasons the valuation claim does.

### D. *Valuation of the Chevrolet Suburban*

■ The trial court valued Shannon's 1983 Chevrolet Suburban, along with an at-

---

13. *See Moffitt v. Moffitt*, 749 P.2d 343, 348 (Alaska 1988) ("To the extent that this issue [of valuation] depends on the credibility of the parties, [the judge] had ample opportunity to evaluate the parties' demeanor on this particular question. Accordingly, we affirm [the judge's] recommendation.").

tached snow plow, at $2,500. Jeff claims that this valuation is clearly erroneous. In support of his argument, Jeff points out that the court heard testimony from Jeff's appraiser, Jane Mulready, who valued the van and plow at $3,750. We find no error in the superior court's valuation of these assets.

Mulready testified as to the Blue Book values for the car, which ranged from a high of $4,550 to a low of $2,275. She also stated that the snow plow had independent value, but she did not separately appraise the plow. Mulready testified that the car needed repairs, but she was unsure what kind of work was required. She based her appraisal in part on her recollection that she had ridden in the car.

But Shannon also testified about the car's value. She stated that she thought the Suburban was worth $1,500 because it needed extensive repairs, but she did not specify what repairs were needed or how much they would cost. She also stated that the snow plow was worth $600. Shannon's testimony thus supported a combined value of $2,100 for the van and the plow.

The court did not explain precisely how it arrived at the $2,500 figure. But the value it chose is within the range of figures offered by Mulready and Shannon. Both witnesses agreed that the car needed substantial repair work, and Mulready's concessions on cross-examination that she was unsure that she had ridden in the car support the court's choice to give Shannon's testimony more weight. The valuation of the Suburban was not clearly erroneous.

#### E. Valuation of the Black Cod Pots

■ Finally, Jeff appeals the valuation of the black cod pots awarded to Shannon. The court assigned a value of zero to the 120 pots. The court had two conflicting estimates of the value of the pots. Mulready valued the pots at an average of $10 each for a total of $1,200. But she admitted that she did not examine each one and that some looked useless. Jeff agreed with the Mulready appraisal. But Shannon, who is a professional fisher, testified that the pots were "garbage" because they were eight or nine years old, purchased in poor shape, stored outdoors,

and rotting. The court did not clearly err when it accepted Shannon's testimony as to the value of the cod pots.

### V. CONCLUSION

Because the trial court did not clearly err when it valued Lot 14 of the Papkes Landing property, the F/V JANE B, Katrina Ann, Inc., the Chevrolet Suburban, and the black cod pots, we AFFIRM.