James **HARROWER**, Appellant/Cross–Appellee,

v.

Dolores **HARROWER**, Appellee/Cross–Appellant.

No. S–9629/10359.

Supreme Court of Alaska.

June 13, 2003.

---

Robert H. Wagstaff, Law Offices of Robert H. Wagstaff, Anchorage, for Appellant/Cross–Appellee.

Robert C. Erwin and Roberta C. Erwin, Erwin & Erwin, LLC, Anchorage, for Appellee/Cross–Appellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

James and Dolores Harrower both appeal the superior court's order dividing the marital property in their divorce proceeding. James contends that the court erred in ruling that his premarital stock was marital property and in its valuation of certain marital assets. We find no error in the challenged valuations but remand for further proceedings concerning the premarital stock. Dolores challenges the court's decision to allow James credit for certain post-separation marital expenditures, its failure to distribute several marital assets, and its refusal to grant Dolores's motion for attorney's fees. Although some of these points may warrant further consideration by the trial court if it revises the property division on remand, we find no error on the current record.

## II. FACTS AND PROCEEDINGS

James and Dolores Harrower were married in 1968. In the mid-seventies, they built the Stony River Lodge, a remote lodge west of Merrill Pass that is accessible only by airplane. In connection with the lodge, the couple ran a flying, guiding, and outdoor recreation business called Northward Bound. Throughout the remainder of the marriage, both worked at the venture. James guided big game hunting trips from the lodge and Dolores provided a variety of services—from cooking and cleaning at the lodge to meeting guests and purchasing supplies in Anchorage. In addition to their work for the lodge, James worked part-time as a dentist in Anchorage, and Dolores was a homemaker.

In the late seventies or early eighties, the Harrowers purchased ten subdivided lots on the Kenai peninsula. And in 1984 they acquired a long-term lease on state property on Lake Hood to use in connection with their business at the Stony River Lodge.

Several years before marrying Dolores, James purchased shares in the Great Consolidated Wrangell Mining Company, a corporation formed by James and several other investors to acquire the historic Kennicott mine and town site in hopes of reselling the property. James inherited some additional shares in the company from his mother after the parties married. The stock remained in James's name throughout the marriage. In the mid-seventies, the company decided to subdivide a portion of the Kennicott property and sell off the lots. The subdivision met with little success. In 1986 or 1987 the shareholders abandoned the effort and decided to attempt to sell the entire Kennicott holding. In 1987 James entered into a marketing contract with the other shareholders, agreeing to locate a buyer for the Kennicott holdings in return for a six-percent sales commission. The original contract was renewed a number of times over the next decade. The Kennicott property finally sold in 1998 to the National Park Service. Upon completion of the sale, James received a commission of $203,400 under the marketing agreement and $572,299.84 for his company shares.

In 1998, after thirty years of marriage, James and Dolores separated and Dolores filed for divorce. The parties settled some of the property issues and tried the contested issues in February 2000. The primary points in contention at trial included whether the proceeds from the sale of James's Kennicott stock were marital property and how to correctly value the Stony River Lodge, the Kenai lots, and the Lake Hood lease.

After trial, the superior court entered its decision on the record. The court found that the Kennicott stock was marital property; the fair market value of the Stony River Lodge was $450,000; the Kenai lots had values between $8,700 and $15,400, as reflected by their tax assessments; and the Lake Hood lease was worth $135,000. The court then divided the marital estate evenly. After making some adjustments on reconsideration to account for post-separation marital expenses, the court entered a written decision adopting its oral findings.

James appeals, arguing that the trial court erred in characterizing his Kennicott shares as marital property. Additionally, he challenges the court's valuation of the Stony River Lodge, the Kenai lots, and the Lake Hood lease. Dolores cross-appeals, challenging the trial court's decision to allow James credit for certain post-separation marital expenditures, its failure to distribute several marital assets, and its refusal to grant her motion for attorney's fees.

## III. DISCUSSION

### A. James's Appeal

#### 1. The Kennicott stock

The parties agree that the Kennicott stock was originally James's separate property and that the commission James received for selling the Kennicott holdings is marital property. But they dispute whether James's stock became marital property during the marriage and whether the funds he received for his shares could properly be divided as part of the marital estate.[1]

We have previously recognized that a spouse's premarital property can become marital through transmutation or active appreciation.[2] Transmutation occurs when married parties intend to make a spouse's separate property marital and their conduct during marriage demonstrates that intent.[3] Active appreciation occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during

---

1. We review the superior court's characterization of property for abuse of discretion, but whether the trial court used the correct legal rule in exercising its discretion is a question of law that we review de novo. *Martin v. Martin*, 52 P.3d 724, 726 (Alaska 2002).

2. *Id.* at 726–27.

3. *Sampson v. Sampson*, 14 P.3d 272, 277 (Alaska 2000); *see also Martin*, 52 P.3d at 727; *Green v. Green*, 29 P.3d 854, 857 (Alaska 2001).

the marriage.[4] In contrast to transmutation, which converts an asset completely from separate to marital, active appreciation recognizes that a separate asset can become partly marital by growing in value during the course of a marriage. Under the latter theory, the asset's value at the inception of the marriage retains its separate character, but any subsequent increase in value is treated as marital property to the extent that it results from active marital conduct: "Appreciation in separate property is marital if it was caused by marital funds or marital efforts; otherwise it remains separate."[5]

■■■ As can be seen, then, the essential elements of active appreciation differ significantly from those of transmutation. While transmutation requires an intent to change the property's separate character and conduct corresponding with that intent, active appreciation requires increased value, marital contribution, and a causal link connecting the two:

> In order to find active appreciation in separate property, the court must make three subsidiary findings. First, it must find that the separate property in question appreciated during the marriage. Second, it must find that the parties made marital contributions to the property. Finally, the court must find a causal connection between the marital contributions and at least part of the appreciation.[6]

In the present case, the trial court's findings blurred the distinction between transmutation and active appreciation. Although at trial it was undisputed that James acquired his stock in the Kennicott holdings as separate property—partly by purchasing it

before he married Dolores and partly by later inheritance from his mother—the court found that his stock became marital property in its entirety during the marriage; the court therefore distributed the net proceeds from the stock sale as part of the marital estate. Yet the court's findings fail to mention the necessary elements of transmutation; the court did not expressly find either that the parties intended to treat James's stock as marital property or that they engaged in any conduct demonstrating their intent.

■■■ Nor could the record sustain a finding of transmutation. Dolores did express her belief that the Kennicott holdings would be part of the couple's retirement. But she acknowledged that James never told her that the property was partly hers. Her subjective belief does not establish "an intent to operate jointly."[7] In *Green v. Green*, we gave examples of conduct that demonstrates an intent to transmute separate property: the property's use as a marital residence; its ongoing maintenance and management by the parties; the listing of its title in joint ownership; or the use of the non-owner spouse's credit to improve the property.[8] Here, the parties did not use James's stock for any marital purpose; James continued to hold it in his own name throughout the marriage; and Dolores did not contribute money, credit, or any appreciable time to the Kennicott holdings. Although James devoted considerable time to his Kennicott holdings, his efforts, standing alone, would not demonstrate an intent to transmute the property. As we have emphasized on other occasions, a finding of transmutation based on management and maintenance of separate property

4. *Martin*, 52 P.3d at 727 n. 10; *Lowdermilk v. Lowdermilk*, 825. P.2d 874, 877–78 (Alaska 1992); *accord* BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.22, at 230 (2d ed.1994).

5. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.22, at 230. James suggests that separate property can become marital through active appreciation only when the *non-owning* spouse contributes marital funds or marital effort. But we find no merit to this position. The majority of courts applying the active appreciation theory hold that marital contributions may be based on either the owning or non-owning spouse's efforts, provided that those efforts are causally connected to an increase in value. *Id.* at 240. And on at

least two prior occasions we have implicitly followed the majority rule by recognizing that an owning spouse's contributions of marital funds or efforts would support a finding of active appreciation. *See Martin*, 52 P.3d at 728; *Lowdermilk*, 825 P.2d at 877–78.

6. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.22, at 236; *see also Martin*, 52 P.3d at 728; *Sampson*, 14 P.3d at 277.

7. *McDaniel v. McDaniel*, 829 P.2d 303, 306 (Alaska 1992).

8. 29 P.3d at 858.

requires significant involvement by both spouses.[9]

Instead of finding that the parties' conduct demonstrated their intent to transmute James's stock into marital property, the court based its ruling on grounds that seem more akin to the theory of active appreciation. Pointing to James's testimony acknowledging that he had put his life into the Kennicott project, the court concluded, "I think under just about any analysis an asset that had been actively pursued with so much marital effort throughout the period of marriage would have to be considered as part of the marital estate." But under the active appreciation theory, this conclusion is problematic. The court's express finding that James contributed active marital effort to the Kennicott project squarely addresses the theory's requirement of a marital contribution to separate property; but it loses sight of the two other necessary elements of the active appreciation theory: appreciation and causation. In context, these elements would have required the court to determine how much James's stock increased in value during the marriage and what part of that increase resulted from active marital efforts.[10] Yet the court failed to address either of these two additional elements.

■ To prevail under the active appreciation theory, Dolores bore the burden of proof on the first two elements—marital contribu-

tion and appreciation.[11] Cases divide as to who bears the burden on the third element, causation. The majority view would assign it to James, requiring him to prove the absence of a causal link between his efforts to market the Kennicott holdings and any appreciation in his stock that occurred during the marriage.[12] Since "the majority rule is almost overwhelming among those cases which consider the issue expressly,"[13] since it "places the burden of proof on the person with the best access to the relevant evidence,"[14] and since it allocates the risk of failure of proof in a way that accurately reflects "the probabilities of the situation,"[15] we choose to follow the majority rule.

■ Here, the record supports the trial court's express finding that James contributed significant marital effort to the Kennicott property. Thus, Dolores met her burden of proof as to the first element of active appreciation. But Dolores did not attempt to establish the extent of any marital increase in the value of James's Kennicott stock. The record fails to disclose the fair market value of James's premarital shares at the time that he married Dolores or the value of his mother's shares at the time he inherited them; and the trial court's findings do not address the issue. Nevertheless, the record would permit a reasonable inference that James's stock experienced a considerable increase in value during the course of the thirty-year

9. *McDaniel*, 829 P.2d at 306 ("Participation by both spouses in the management and maintenance of the property will not automatically transform pre-marital into marital property. Rather, the participation must be significant and evidence an intent to operate jointly.").

10. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.22, at 236; *cf. Lowdermilk*, 825 P.2d at 877–78 (finding that spouse should not be allowed to keep contributions of time and effort out of marital estate by rolling them into a separately owned premarital business).

11. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.22, at 236 ("There is general agreement that the burden of proving marital contributions and the burden of proving an increase in value are on the spouse who seeks to classify appreciation as active.").

12. *Id.* ("[A] majority of states place the burden on the owning spouse to prove that the marital

contributions did not cause the increase in value.").

13. *Id.*

14. *Id.* at 237.

15. 2 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 337, at 413 (5th ed.1999). As MCCORMICK warns, a party's control over the facts regarding the disputed issue "should not be overemphasized" as a consideration in allocating the burden of proof. *Id.* "Perhaps a more frequently significant consideration in the fixing of the burdens of proof is the judicial estimate of the probabilities of the situation. The risk of failure of proof may be placed upon the party who contends that the more unusual event has occurred." *Id.* Once the proponent of an active appreciation claim establishes marital appreciation and a contribution of marital funds or effort, we think that the absence of a causal link would be "the more unusual event."

marriage. Thus, Dolores arguably met her burden as to the second element of active appreciation by making a prima facie showing that at least some appreciation occurred. As to the third element of active appreciation, causation, the record is almost completely silent. James did not attempt to establish the lack of a causal link between his marketing efforts and the price ultimately paid for the Kennicott holdings; and the trial court failed to address the point in its findings and conclusions.[16]

In summary, then, although the record does not support the trial court's conclusion that James's interest in the Kennicott holdings transmuted entirely into marital property, the evidence could conceivably support a narrower finding that a part of the sale proceeds was marital because it reflected an increase in value resulting from James's contribution of active marital effort, as opposed to any increase in value that was passive—in other words, appreciation that was not the result of James's marital efforts. But neither the trial court nor the parties addressed all of the elements necessary to support a finding of active appreciation. Accordingly, we must vacate the court's conclusion that the sale proceeds were marital property in their entirety and remand for additional proceedings on the issue of active appreciation.[17]

### 2. The Stony River Lodge

▮ The trial court valued the Stony River Lodge at $450,000. This was the value attributed to the lodge in an appraisal that James received approximately a year before Dolores filed for divorce. The appraisal had been prepared at James's request by an acquaintance, Rick Richter, for use in connection with a bankruptcy proceeding. In the divorce proceedings, Dolores relied on Richter's appraised value; but James called Richter as a witness to establish that the lodge's actual value was lower than that stated in his earlier appraisal. Richter confirmed the appraisal's estimate that the lodge had a "market value" of $450,000. But he attempted to qualify this estimate, testifying that the appraisal's reference to "market value" indicated a value based on the customary financing terms prevalent in the rural Alaskan real estate market—a ten to twenty percent down payment with seller financing. To arrive at the lodge's present *cash* value, Richter explained, it would be necessary to deduct an additional forty to sixty percent from the "market value" stated in his original appraisal. Using this cash discount theory, Richter estimated the lodge's present value at forty to sixty percent of $450,000.

The superior court rejected this testimony, finding the lodge's value to be $450,000, as stated in Richter's original appraisal. On appeal James contends that this finding is clearly erroneous.[18] He argues that "market value" is a term of art and that the trial court improperly disregarded Richter's unrefuted

16. The record does show that James received a commission of $203,400 under the terms of his marketing agreement for his efforts in selling the property; James did not dispute the trial court's treatment of these funds as marital property. The trial court expressly concluded that this commission had no effect on the marital status of James's Kennicott stock. We agree with this aspect of the trial court's ruling. As TURNER explains,

> Under equitable distribution law, all appreciation created by marital efforts is marital property. Where the value of the resulting appreciation is greater than the value of the efforts which were used to create it, the appreciation should still be marital property. Thus, in determining issues of active appreciation, the courts should generally attach no importance to the size of the owning spouse's salary. The marital estate is entitled to actual value created, and not merely to the value of the efforts spent.

TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.22, at 259 (2d ed. Supp.2002).

17. If the superior court's reexamination of this issue leads it to conclude that the marital portion of the sale proceeds is appreciably less than the full value of the sale proceeds, which the court originally found to be marital property, the court will have discretion to reopen the broader question of how to equitably divide the value of the marital estate as redetermined on remand; and in exercising this discretion, the court will be authorized to consider whether invasion of separate property is necessary to ensure a fair and equitable distribution. *See Merrill v. Merrill*, 368 P.2d 546, 547 n. 4 (Alaska 1962).

18. Whether the court correctly valued the assets to be divided is a question of fact that we review for clear error. *Martin v. Martin*, 52 P.3d, 724, 726 (Alaska 2002).

expert testimony concerning its meaning. Citing *McQueary v. McQueary* for the proposition that "proper valuation of marital assets requires the reduction of streams of future payments to present value," [19] James maintains that the trial court should have assigned a present cash value to the lodge by applying Richter's cash discount method.

Yet the record establishes that the trial court fully considered Richter's testimony. Although accepting Richter's premise that it needed to determine the lodge's present cash value, the court rejected his proposed method of calculating that value. In the court's view, Richter's original appraisal already incorporated adjustments to reflect present cash value and therefore required no further reduction. While the court recognized that Richter disagreed with this conclusion, it expressly found that he was not a credible witness, describing his testimony as that of "an advocate choosing arguments for a preconceived result, not an objective expert." [20] Furthermore, the court noted, Richter's trial testimony concerning an additional discount "was completely contradicted by the very words that Mr. Richter put in the appraisal itself."

The record supports this finding of contradiction. While Richter insisted at trial that an additional discount of forty to sixty percent would be needed to make his original appraisal's estimate of "market value" reflect the lodge's present cash value, the appraisal itself expressly defined "market value" as a term that reflected a sale occurring "under conditions whereby . . . payment is made in *terms of cash* in U.S. dollars, or in terms of financial arrangements comparable thereto." [21] Richter did not attempt to reconcile this definition with his apparently contradictory position at trial that the appraisal's use of "market value" reflected a value based on long-term seller financing.

Because "[i]t is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence," [22] we have consistently recognized that appellate review of trial court rulings based on testimonial credibility must give "due regard to the opportunity of the trial court to judge the credibility of the witnesses." [23] Having reviewed the record with due regard for the trial court's unique ability to assess the credibility of testimony, we hold that the court's valuation of the Stony River Lodge was not clearly erroneous.

### 3. The Kenai lots

James also relied on Richter to testify about the value of the parties' Kenai lots. Recent tax assessments had valued the ten lots at between $8,700 and $15,400. Richter estimated their value at $7,000 to $16,000 but qualified these estimates by stating that, because of their rural recreational nature, the lots would have to be sold on terms and could not be expected to sell all in one year. Accordingly, Richter maintained, it was necessary to perform a discounted cash flow analysis; he did so using two different discount rates, both resulting in substantial decreases in value. The trial court rejected Richter's testimony and adopted the lots' assessed val-

---

**19.** 902 P.2d 1326, 1327 (Alaska 1995).

**20.** In finding Richter's trial testimony to be reflective of bias, the court emphasized that Richter and James had known each other for at least fifteen years and that James's interest in the lodge's appraised value differed markedly in the current divorce case, where he would benefit from a low appraisal, from his interest in the bankruptcy proceeding for which the original appraisal was prepared, where he would have benefitted from a high appraisal.

**21.** Richter's original appraisal contains the following definition:

"Market Value" means the *most probable price* which a property should bring in a competitive and open market under all conditions requisite to a fair sale. . . . Implicit in this definition is . . . the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are *typically* motivated;
. . . .
4. payment is made *in terms of cash* in U.S. dollars, or in terms of financial arrangements comparable thereto; and
5. the price represents the *normal consideration* for the property sold. . . .

(Emphasis added.)

**22.** *Davila v. Davila*, 876 P.2d 1089, 1092 (Alaska 1994) (citation omitted).

**23.** Alaska R. Civ. P. 52(a); *see also Berg v. Berg*, 983 P.2d 1244, 1248 (Alaska 1999); *Moffitt v. Moffitt*, 749 P.2d 343, 348 (Alaska 1988).

ues. On appeal, James contends that the superior court erred in relying on the tax appraisals and in rejecting Richter's discounted cash analysis.

In other procedural contexts, we have made it clear that "[t]ax appraisals do not reliably measure true value." [24] But here, the parties did not dispute the accuracy of the tax appraisals as a starting point for valuation; the only real dispute was whether the assessed value needed to be discounted. In her trial brief, Dolores offered the tax assessments as her evidence establishing the value of the Kenai lots. James did not object to the admissibility of the assessments and did not offer alternative values for the lots or any values, for that matter, in his trial brief. And at trial, James's expert, Richter, adopted similar values as his starting point for calculating the lots' discounted values. If any appreciable error occurred, then, it arose not from the court's acceptance of the lots' assessed values but from its rejection of Richter's cash discount analysis.

As with the Stony River Lodge, however, the trial court found Richter's testimony incredible. Thus, our review of the court's findings concerning the Kenai lots is governed by the same narrow test we applied in reviewing the court's findings concerning the Stony River Lodge. Because neither party objected to the admission of the tax assessments to establish value, because the court's credibility determination is supported by the record, and because the value assigned to the lots is within the range of evidence presented at trial,[25] we conclude that the trial court's valuation of the Kenai lots is not clearly erroneous.

#### 4. The Lake Hood lease

■ The thirty-three-year Lake Hood lease was purchased for $100,000 in 1984. It had seventeen years remaining at the time of trial but was renewable subject to certain improvements. During his pretrial deposition, James agreed that $135,000 was a fair value for the lease. At trial, James admitted his deposition valuation but testified that he valued the lease at only $66,000 by prorating its total value to reflect the unexpired term. No other evidence was presented regarding the lease's value. The trial court valued the lease at $135,000, stating that James had not "challenge[d] the $135,000 full lease value."

James argues that this finding is clearly erroneous, but his argument lacks merit. Throughout the divorce proceedings Dolores listed the lease as having a fair market value of $135,000; James never contested these listings and provided no alternative value until he testified at trial. Moreover, in his pretrial deposition, James acknowledged that $135,000 was a fair value for the lease. Furthermore, the trial court could properly view James's trial testimony, which attempted to reduce that value, as self-serving, since, by the time of trial, James knew that the lease would be awarded to him and was therefore aware that he stood to gain by obtaining a low valuation. We find no clear error.

### B. Dolores's Cross–Appeal

#### 1. Failure to distribute marital assets

■ In her cross-appeal, Dolores asserts that a Helio airplane engine, a Chevrolet van, and a Saab vehicle retained by James were erroneously unaccounted for by the trial court in the property division. James responds that Dolores failed to raise this issue below.

The record supports James's position. None of the disputed items appeared among the marital assets listed in either Dolores's pretrial financial declaration or her trial brief. Furthermore, in her closing argument

---

**24.** *Bennett v. Artus,* 20 P.3d 560, 565 (Alaska 2001) (disapproving assumption that appreciation can be accurately measured by the difference between two tax appraisals); *accord Zerbetz v. Municipality of Anchorage,* 856 P.2d 777, 783 (Alaska 1993) (rejecting reliance on tax appraisals to show diminished value in inverse condemnation proceeding); *State v. 45,621 Sq. Ft. of Land,* 475 P.2d 553, 557–58 (Alaska 1970) (tax appraisals inadmissible to prove fair market value in condemnation proceedings).

**25.** *See Berg,* 983 P.2d at 1249 (valuation of automobile and snow plow was not clearly erroneous where valuation fell within range of valuation evidence presented by both former husband and wife).

Dolores stated that she was not contesting various items of personal property that James was keeping.

Dolores did make some note of the three disputed items in attachments to her responses to James's post-trial motion for relief from judgment. But she listed the items only to support her position that the court should refrain from altering its original distribution. Indeed, Dolores expressly maintained that the only additional asset the court should consider was a recent $30,000 payment that the parties had received from the sale of some real property.

We have previously recognized that all the marital property to be divided in a divorce proceeding must be called to the trial court's attention.[26] Because Dolores failed to identify the Helio engine, Chevrolet van, or Saab as marital assets subject to division by the superior court, we conclude that she has not preserved her claims to those items for purposes of appeal.[27]

### 2. Post-separation expenditures of Kennicott proceeds

After concluding that James's Kennicott stock was marital, the trial court calculated the net proceeds from the stock's sale and awarded them to Dolores as part of her half of the marital property. By the time the court entered its final order, James had already paid Dolores $353,000 from the sale proceeds; deducting that payment from the total net proceeds, the court found that James owed Dolores an additional $206,604 and ordered him to pay her that sum.

James moved for reconsideration and relief from the judgment, claiming that the remaining sale proceeds no longer existed because he had used them to pay marital expenses

after the couple's separation. The trial court reopened the evidence, asked for an additional deposition of James, and held two evidentiary hearings concerning the alleged post-separation expenditures. After considering the new evidence, the court amended its original distribution to conform to James's accounting—essentially finding that James's post-separation payments of marital expenses had exhausted his remaining Kennicott proceeds, leaving nothing to divide between the parties. After adjusting for some smaller errors and omissions that are irrelevant here, the court recalculated the total marital estate and redivided it evenly.

Dolores now challenges the court's characterization of James's post-separation expenditures as payments for marital expenses, insisting that James spent most of the disputed funds for non-marital purposes. But as the superior court correctly recognized, Dolores did not challenge James's deposition testimony concerning the amounts or purposes of his post-trial expenses. Accordingly, the record supports the court's finding in this regard.

Dolores alternatively asserts that James's post-separation expenses should not be treated as having been paid out of marital funds. Instead, she maintains, the parties' separation date should be used to classify these expenditures, since James had complete control over all the property and money after separation and could do whatever he wanted with both.

But our case law establishes that marital assets should usually be valued as of the date of trial and that "neither party is charged for loss in the value of marital property occurring in the interim between separation and trial."[28] We have held that in special cir-

**26.** See Faulkner v. Goldfuss, 46 P.3d 993, 1004 (Alaska 2002) (stating valuation argument was not preserved because wife did not seek such valuation at trial); Brotherton v. Brotherton, 941 P.2d 1241, 1245 (Alaska 1997) (citing well-established rule that it is the duty of parties to ensure that all necessary evidence is presented in divorce proceedings).

**27.** See Gates v. City of Tenakee Springs, 822 P.2d 455, 460–61 (Alaska 1991) (stating that new matters raised for the first time on appeal will not be considered); Zeman v. Lufthansa German Air-

lines, 699 P.2d 1274, 1280 (Alaska 1985) (noting general rule that parties may not raise new issues on appeal to obtain reversal). Dolores also contends that the superior court mistakenly overstated the amount of attorney's fees paid by James in connection with the Kennicott sale. We need not consider the issue, since the trial court corrected the mistake in its final judgment.

**28.** Ogden v. Ogden, 39 P.3d 513, 521 (Alaska 2002); see also Brandal v. Shangin, 36 P.3d 1188, 1194 (Alaska 2002) ("Normally, an asset

cumstances, "[w]here there is evidence that a marital asset was dissipated, wasted, or converted to a non-marital form, the court can 'recapture' the asset by giving it an earlier valuation date and crediting all or part of it to the account of the party who controlled the asset." [29]  Yet the record in this case reveals no obvious dissipation, waste, or conversion of any marital assets by James.

Dolores nonetheless argues that James expended some $200,000 of the Kennicott proceeds on the Stony River Lodge and its related guiding business, knowing that these marital assets would ultimately be awarded to him.[30]  In effect, then, she reasons, the court allowed James to convert marital property—the Kennicott proceeds—to separate property without charging him for the conversion.

But the record establishes that Dolores did not specifically argue this theory of recapture below, and the trial court had no occasion to consider it.  Moreover, Dolores's recapture argument presumes that the Kennicott stock proceeds were marital property.  In light of our decision to remand for reconsideration of the court's finding that the proceeds were marital, the recapture issue may ultimately prove academic.  In any event, Dolores will now be able to advance her theory of recap-

ture to the trial court on remand.[31]  Accordingly, we find no need to resolve the recapture issue here.

### 3. Attorney's fees

■ Dolores's last argument is that the trial court abused its discretion by refusing to award her attorney's fees.  She points out that she is in poor health and has no earning capacity, while James is in good health and has several ready sources of income.

Attorney's fees in divorce proceedings are governed by AS 25.24.140,[32] which requires the trial court to base its award "primarily on the relative economic situations and earning powers of the parties." [33]  Because this provision is designed to allow divorcing parties to litigate on an equal plane,[34] we have held that an award of fees will generally be required "only to the economically disadvantaged divorce litigant." [35]  More specifically, we have held that a trial court may properly decline to award fees even when one spouse earns significantly less than the other, as long as both parties' "resources are sufficient for the superior court to reasonably expect [them] to pay [their] own fees." [36]

Here, the trial court found that its overall property distribution left James and Dolores

that no longer exists at the time of trial is not available for distribution.").·

29.  *Foster v. Foster*, 883 P.2d 397, 400 (Alaska 1994); *see also Brandal*, 36 P.3d at 1194 (stating that asset may be recaptured for "dissipation, waste, or conversion with the intent to deprive the marital estate"); *Ogard v. Ogard*, 808 P.2d 815, 819–20 (Alaska 1991) (explaining that special situations may require use of valuation date other·than date of trial).  The trial court must make specific findings as to why an earlier valuation date is more appropriate.  *See, e.g., Green v. Green*, 29 P.3d 854, 859 (Alaska 2001).

30.  The record does support Dolores's assertion that James was assured of receiving the Stony River Lodge so that he could continue to operate the business, since Dolores indicated that she did not want the lodge.

31.  In this regard, we note that our decision remanding for redetermination of the character of the Kennicott stock proceeds has no effect on the court's characterization of James's marketing commission as marital property.  Assuming that Dolores raises the issue on remand, we do not preclude the superior court from considering

whether recapture of any part of the commission is warranted, regardless of whether the court finds James's net sale proceeds to be separate property.

32.  AS 25.24.140 provides in part:

(a) During the pendency of the action, a spouse may, upon application and in appropriate circumstances, be awarded expenses, including
(1) attorney fees and costs that reasonably approximate the actual fees and costs required to prosecute or defend the action. . . .

33.  *Edelman v. Edelman*, 3 P.3d 348, 359 (Alaska 2000) (quoting *Beard v. Beard*, 947 P.2d 831, 833 (Alaska 1997)).

34.  *Broadribb v. Broadribb*, 956 P.2d 1222, 1229 (Alaska 1998).

35.  *Nicholson v. Wolfe*, 974 P.2d 417, 427 (Alaska 1999).

36.  *Davila v. Davila*, 908 P.2d 1027, 1035 (Alaska 1995).

in relatively equal economic situations with respect to their ability to pay their own fees. More particularly, the superior court reasoned that an award of fees was unnecessary because the estate was large, both parties had received income-producing properties, and each had sufficient liquidity. The record supports these findings and establishes that the court's ruling fell within the bounds of its broad discretion.[37]

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings consistent with this opinion.

---

**37.** However, because our holding requiring the superior court to reexamine its ruling on the marital character of the Kennicott stock may significantly alter the overall marital distribution, the court will have broad discretion on remand to reconsider its attorney's fee ruling if it finds any significant change in the relevant circumstances.