*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Estate of | ) | |
| | ) | Supreme Court No. S-17739 |
| ALEXINA RODMAN. | ) | |
| | ) | Superior Court No. 3KN-15-00015 PR |
| | ) | |
| | ) | O P I N I O N |
| | ) | |
| | ) | No. 7569 – November 19, 2021 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Jennifer K. Wells, Judge.

Appearances: Kristine A. Schmidt and Robert J. Molloy, Molloy Schmidt LLC, Kenai, for Glenn S. Rodman. Notice of nonparticipation filed by Blaine D. Gilman, Gilman & Pevehouse, Kenai, for Estate of Alexina Rodman.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

BORGHESAN, Justice.

## I.     INTRODUCTION

This appeal primarily concerns whether the statute of frauds bars enforcement of alleged contracts for the sale of land and, if so, whether the alternative remedy of restitution is warranted. After a woman died and left a will disposing of several parcels of real property and two trailers, her ex-husband — with whom she had maintained a romantic relationship following divorce — filed claims against the

woman's estate for those properties. He maintains that the decedent had transferred title to three of those parcels to him. He also asserts that they made an agreement about two parcels and the trailer that sits on them: he and the decedent would live there until their deaths, after which the properties would be sold and the proceeds given solely to their great-grandchild. The estate rejected these claims, invoking the statute of frauds. The superior court ruled in favor of the estate, finding that the man had failed to prove the existence of contracts satisfying the statute of frauds and rejecting his alternative claims for restitution. On appeal, the man argues that the proceedings were marred by procedural flaws and challenges the superior court's decision on the merits. We largely affirm the superior court's decision, but remand for further proceedings on the restitution claim involving one parcel.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Glenn Rodman, the appellant in this probate matter, and Alexina Rodman,[1] the deceased, married around 1991 and divorced in 2002. They resumed their relationship six to eight months later (without remarrying) and stayed together for the most part until Alexina died in December 2014.

Over time the Rodmans began to acquire property in the Aurora Heights Subdivision in Nikiski. According to Glenn, although Alexina initially acquired most of these lots in her name, he made most of the payments because she often needed money, especially after she encountered health problems. Glenn claims he acquired ownership over most of the lots by paying her with cash, check, labor, and improvements. Two parcels — Lots 4 and 5 of the subdivision — were unquestionably

---

[1]    In this opinion we refer to the Rodmans by their first names for clarity's sake, intending no disrespect.

conveyed to Glenn by Alexina and are not at issue in this case. Ownership of Lots 2, 6, 7, and 8 of the subdivision is disputed and is the subject of this appeal.

Glenn and Alexina also bought trailers for some of the lots. According to Glenn, they jointly purchased two trailers and placed one on Lot 6 and the other on Lots 7 and 8. Glenn claims that he invested significant labor and money to improve the trailers. He testified that the Lot 6 trailer was "trashed" in a fire, so he now uses it to store his tools.

According to Glenn, as he and Alexina grew older their goals for Lots 7 and 8 and the trailer on those lots were to make their lives easier and support their great-grandchild. Glenn testified about their close relationship with this great-grandchild. According to Glenn, the great-grandchild lived with the Rodmans from when she was about 8 months old until she was almost 12 years old. Glenn testified that the great-grandchild wanted to go to engineering school. He stated that he and Alexina "sat down and . . . talked about it" and agreed that "the only way [the great-grandchild] would get there was . . . through us dying, and then giv[ing] the property to [her] to sell."

About a year and a half before Alexina died, she was diagnosed with cancer. She frequently traveled back and forth to her native country of Scotland and also sought medical treatment there. According to Glenn, a few days prior to what would be Alexina's last trip to Scotland, Glenn requested quitclaim deeds to Lots 2 and 6. Glenn maintained that Alexina filled out but did not sign the deeds because she was feeling unwell and did not want to travel to town to get them notarized. The next day, unbeknownst to Glenn, Alexina executed a witnessed and notarized will stating:

> a)     Glenn Rodman ex-husband, can live in my house until his death. Upon his death the house will be sold. It may not be sold before that.

b)     The money from the house being sold will be equally divided between Merle Welch (daughter), George Stewart (son), Terry Stewart (son) and [the great-grandchild]

. . .

e)     Lots that are to be sold are Block 2 Lot 7, and 8 with house[.]

The will named Merle Welch, Alexina's daughter, as the executor.

Glenn testified that Alexina did not tell him about the will, and that he was surprised by its terms after learning of it. He claimed that he and Alexina had agreements in place that were contrary to the will's terms and that the properties it described were not Alexina's to devise.

**B.     Proceedings**

In January 2015 Alexina's daughter filed a petition for informal probate of the will, seeking her appointment as personal representative of Alexina's estate. Glenn made a claim against the estate the next month, alleging that he was entitled to deeds to Lots 2 and 6; owned the addition to the Lot 7/8 trailer; and had originally purchased Lot 7 from Alexina, but later agreed to create a life estate on Lots 7 and 8 with Alexina, with all proceeds from sale of those lots going to the great-grandchild's college fund. The estate disallowed the claims in May 2015.

In July 2015 Glenn petitioned the probate court to allow his claims against the estate. Two weeks later, Glenn filed titles with the DMV to the trailers on Lot 6 and Lots 7/8. Glenn testified that Alexina gave him title to the trailers before she died, but he was unable to state when she actually signed them. The estate accused Glenn of forging the signatures on these titles. Following an evidentiary hearing in May 2016, the superior court issued a number of orders in January 2017, including one establishing a life estate for Glenn on Lots 7 and 8 with distribution of the remainder according to the terms of the will.

A new judge took over the case and issued an order in April 2017 rejecting Glenn's argument that there was a special legal relationship between him and Alexina that could alter the distribution of Alexina's property. Alexina's daughter, as personal representative for the estate, filed a motion to quiet title to the trailers in June 2017, and the new judge heard argument on these motions in November 2017, with both Glenn and Alexina's daughter testifying. Following the hearing, the superior court found that the Lot 7/8 trailer belonged to the estate because there was no valid transfer to Glenn, but denied the estate's claim to the Lot 6 trailer. The court also ruled that the estate failed to prove forgery.

Glenn appealed these orders. We affirmed the order regarding the legal significance of Glenn and Alexina's relationship but vacated the orders regarding ownership of the Lot 7/8 trailer. We ruled that "Glenn's ownership claims to particular lots included in the estate, the [Lot 7/8] trailer, and the addition to the [Lot 7/8] trailer are closely related," and we ordered the superior court to decide ownership of the trailer in the context of deciding all of the related claims of ownership of the lots and trailer.[2]

After remand the superior court issued an order in November 2019 describing key facts and legal issues left to be decided. This order advised the parties that they could request another opportunity to present evidence or allow the court to make a decision on the existing record. However, due to an error by the clerk of court, Glenn's counsel never received notice of this order. The superior court entered a final decision on remand in January 2020. The order denied Glenn's claim of ownership to Lots 2, 6, and 7; his claim of joint ownership of Lots 7 and 8, with full remainder to the

---

[2]    *In Re Estate of Rodman*, No. S-16999, 2019 WL 1976095, at *3 (Alaska May 1, 2019).

great-grandchild; and his claim to ownership of the Lot 7/8 trailer. The court also rejected Glenn's claims for restitution. This appeal followed.

## III.   STANDARD OF REVIEW

Glenn alleges that the "piecemeal process" and lack of evidentiary hearings he received from the superior court deprived him of his due process rights. We review questions of due process de novo and adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[3]

Glenn also argues that the superior court misapplied the statute of frauds in ruling that there were not enforceable contracts to sell the lots. "We apply our independent judgment to the interpretation of Alaska statutes and will interpret statutes 'according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters.' "[4] However, the superior court's underlying "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."[5]

Glenn argues that if his contract claims fail he is entitled to restitution because the estate was unjustly enriched. "Whether there has been unjust enrichment is

---

[3]     *Anderson v. Alaska Hous. Fin. Corp.*, 462 P.3d 19, 25 (Alaska 2020) (quoting *Dennis O. v. Stephanie O.*, 393 P.3d 401, 405-06 (Alaska 2017)).

[4]     *Taylor v. Wells Fargo Home Mortg.*, 301 P.3d 182, 188 (Alaska 2013) (quoting *In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011)); *see also* AS 09.25.010 (statute of frauds).

[5]     *Lewis v. Anchorage Asphalt Paving Co.*, 579 P.2d 532, 534 (Alaska 1978) (quoting Alaska R. Civ. P. 52(a)).

generally a question of fact.  As such, the trial court's determination should not be set aside unless clearly erroneous."[6]

## IV.    DISCUSSION

### A.    We Do Not Address Glenn's Argument Regarding The Distribution Error Because It Was Raised For The First Time On Appeal.

Glenn asserts that he never received notice of the preliminary order on remand, which gave the parties a chance to request a hearing to present additional evidence on the issues to be decided.  Instead he asserts that he only learned of it several months later while reviewing the record for this appeal.  The clerk of the Kenai superior court confirmed this account in an affidavit, which states that due to a distribution error the order was never sent.  Glenn argues that the clerk's mistake deprived him of "the opportunity to review preliminary findings and conclusions of the probate court, or have an evidentiary hearing on remand."

"Ordinarily, a party seeking to raise an issue on appeal must have raised it and offered evidence on it in the trial court."[7]  "Therefore, issues not properly raised in the trial court will not ordinarily be considered on appeal."[8]  "This rule is based on the belief that permitting a party to claim error regarding a claim not raised and litigated below 'is both unfair to the trial court and unjust to the opposing litigant.' "[9]  Although

---

[6]    *State, Dep't of Revenue, Child Support Enf't. Div. v. Wetherelt*, 931 P.2d 383, 390 n.11 (Alaska 1997).

[7]    *Harvey v. Cook*, 172 P.3d 794, 802 (Alaska 2007).

[8]    *Id.*

[9]    *Id.* (quoting *In re Marriage of Walker*, 42 Cal. Rptr. 3d 325, 332 (Cal. App. 2006)).  *See* 4 C.J.S. APPEAL AND ERROR § 292 (2021) ("Generally, questions of whatever nature, not raised and properly preserved for review in the trial court, will not be noticed on appeal.  . . . The general rule is usually based on the ground that it would
(continued...)

Glenn has provided evidence that there was an error by the clerk of court, because this issue was never raised below, it is not properly before us on appeal, and we decline to address it.[10] The proper avenue for relief from this mistake is Alaska Rule of Civil Procedure 60(b)(1), which allows a party to seek relief from an order or judgment for various reasons including "mistake, inadvertence, surprise or excusable neglect."[11]

Glenn argues that the distribution error violated Civil Rule 73(d) — which requires that the court clerk give notice "[i]mmediately upon the entry of an order or judgment" — and that this error is reviewable on direct appeal, citing *Princiotta v. Municipality of Anchorage.*[12] But in *Princiotta* we reviewed the denial of a motion for relief from judgment under Civil Rule 60(b), holding that a distribution error tolled the time period for seeking relief under that rule.[13] *Princiotta* does not stand for the proposition that we can review distribution errors when the affected litigant has not first

---

**9** (...continued)
be unjust to the opposing litigant, who should have the proper opportunity to avoid, by amendment or by supplying any defects in his or her proof, the effect of the objection. . . . [T]he appellate court [also] generally refuses to consider arguments raised for the first time on appeal because it is fundamentally unfair to fault the trial court for failing to rule on an issue it was never given the opportunity to consider." (footnotes omitted)).

**10** *Windel v. Carnahan*, 379 P.3d 971, 980 (Alaska 2016) ("We have held that '[i]ssues not properly raised or briefed at trial are not properly before this court on appeal.' " (alteration in original) (quoting *Burts v. Burts*, 266 P.3d 337, 344 (Alaska 2011))).

**11** Alaska R. Civ. P. 60(b)(1).

**12** 785 P.2d 559 (Alaska 1990).

**13** *Id.* at 561-62.

sought relief from the trial court. Glenn must use the procedures designated in the civil rules to seek this relief before we may consider the issue.

### B. Glenn's Due Process Arguments Are Also Waived.

Due process "requires notice and opportunity for hearing appropriate to the nature of the case."[14] When due process applies, litigants are entitled to a hearing that gives them "the opportunity to present the quantum of evidence needed to make an informed and principled determination."[15]

Glenn argues that the proceedings in the superior court violated his right to due process because he was not given sufficient opportunity to present evidence in support of his claims.[16] He maintains that he was entitled to a "trial with pretrial procedures under the civil rules" rather than the evidentiary hearing he received.

But Glenn's due process argument is waived because he never argued to the trial court that due process entitled him to specific procedures, nor did he inform the trial court that he needed more time to present his evidence.[17] On appeal, he cites a due

---

[14] *Laura B. v. Wade B.*, 424 P.3d 315, 317 (Alaska 2018) (quoting *Debra P. v. Laurence S.*, 309 P.3d 1258, 1261 (Alaska 2013)).

[15] *Id.* (quoting *Debra P.*, 309 P.3d at 1261).

[16] Glenn's briefing attempts to incorporate arguments made in the briefing on the prior appeal in this case. "[W]e have long held that a party's briefing must contain its own arguments and may not merely incorporate arguments from other documents." *McCormick v. Chippewa, Inc.*, 459 P.3d 1172, 1180 (Alaska 2020) (noting that rules of appellate procedures prescribe "a strict page limit with limited exceptions" and that "allowing incorporation of other briefing 'would enable wholesale circumvention of our appellate rules' " (quoting *Com v. Briggs*, 12 A.3d 291, 343 (Pa. 2011))). Therefore we decline to address the specific arguments that Glenn attempts to incorporate.

[17] *See Conkey v. State, Dep't. of Admin., Div. of Motor Vehicles*, 113 P.3d 1235, 1237 n.6 (Alaska 2005) (holding due process argument waived by litigant's failure
(continued...)

process argument he made in opposition to the estate's motion to quiet title. But Glenn's argument then was that the court should strike the motion entirely because granting it without a hearing would deprive him of due process. In response the superior court held a hearing on the motion and invited Glenn to present evidence. Yet Glenn objected to the taking of evidence, arguing that the court should decide the motion on the existing record. Thus Glenn did not argue that due process required giving him more opportunity to present evidence — he in fact argued the contrary — nor does he point us to any other place in the record where he argued that due process required additional procedures.

In fact, with one limited exception addressed below, Glenn does not appear to have ever asked the superior court for additional hearing time or discovery procedures. He twice asked the court for a pre-trial scheduling conference, but he did not request any specific discovery or hearing procedures. The closest Glenn came to a request for specific procedures was in his claim against the estate, which requested a pretrial conference to schedule "the evidentiary hearing or trial" and "provide for any other pretrial procedures that the court deems to be just and proper in the circumstances." The lack of specific request meant that the court did not have specific hearing or discovery procedures to rule on. And nowhere in Glenn's oral presentation or briefing did he inform the superior court that he needed more time to present his case.

The only time Glenn requested an additional opportunity for hearing was in his brief on remand, where he argued that if his "specific claims are denied in whole or part, then he requests an evidentiary hearing to prove his right to compensation under theories of quantum meruit and unjust enrichment." A litigant does not get a second bite at the apple if its primary claims fail. Rather, a litigant has the duty to present evidence

---

[17]      (...continued)
to present it to the superior court).

for all its claims, primary or alternative, in the time allotted — or to timely advise the court if the allotted time is not enough. Because Glenn never timely advised the superior court that he would need additional time or procedures in order to adequately present his claims, his argument that the superior court violated his right to due process is waived.[18]

### C. The Superior Court Did Not Err By Denying Glenn's Claims To Ownership Of Lots 2, 6, 7, 8, And The Trailer On Lots 7 and 8.

Glenn claims that he owned (in one form or another) Lots 2, 6, 7, and 8, maintaining that Alexina agreed to convey these parcels to him in exchange for various forms of consideration, including cash, labor, and improvements to the properties. He claims that Alexina transferred ownership of Lots 2, 6, and 7 to him outright. In addition, for Lots 7 and 8 and the trailer that sits upon them, he claims that he and Alexina agreed to share life estates, with the remainder of the property going entirely to their great-grandchild. The estate defended against Glenn's claims by invoking the statute of frauds.

Under the statute of frauds, "contracts for the sale of land are unenforceable unless the agreement is in writing or a note or memorandum of it is in writing and signed by the party, or his agent, who seeks to avoid performance."[19] "This note or

---

[18]    Glenn also argues that he was deprived of due process by the superior court's distribution error. As described in Section IV.A of this opinion, the distribution error issue is not properly before us, so we do not consider it.

[19]    *Fleckenstein v. Faccio*, 619 P.2d 1016, 1020 (Alaska 1980); *see also* AS 09.25.010(b). Glenn argues that the court applied the wrong subsection of the statute of frauds and claims that instead of applying AS 09.25.010(b), it should have applied subsection (a)(6). But for purposes of this case, the distinction between these subsections is irrelevant. Both subsections require a signed writing in order to enforce an agreement about an "interest in real property" (other than a lease for less than one year). Further, we have previously applied subsection (b) and the relevant statutory exceptions in AS 09.25.020 where parties claim the existence of an oral contract to sell

(continued...)

memorandum need not be formal or complete."[20]  It is enough that the note or memorandum, "when considered with the admitted facts, the surrounding circumstances, and all explanatory and corroborative and rebutting evidence, [convinces] the court that there is no serious possibility of consummating a fraud by enforcement."[21]  But although "extrinsic evidence may be received to show the application of the terms of the description given in the memorandum," extrinsic evidence cannot "supply missing elements without which the description is hopelessly defective."[22]

Absent a written contract that is fully enforceable under the statute of frauds, a party may obtain specific performance of an oral agreement for the sale of land under certain conditions.  "A party seeking specific performance of an oral contract to convey an interest in real property must first show that the agreement was taken out of the statute of frauds, such as by part performance."[23]  "Next, he must prove the existence of a contract sufficiently definite and certain in its terms to warrant a grant of specific performance."[24]  "Formation of a contract requires an offer, encompassing all essential terms, an unequivocal acceptance by the offeree of all terms of the offer, consideration,

---

[19]     (...continued)
land.  *See, e.g.*, *Curran v. Hastreiter*, 579 P.2d 524, 528-30 (Alaska 1978); *Aiken v. Jefferson*, 550 P.2d 813, 814-15 (Alaska 1976).  Thus, it was not error to apply subsection (b) instead of (a)(6).

[20]     *Fleckenstein*, 619 P.2d at 1020.

[21]     *Id.* (quoting 2A ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 498 at 681 (1950)).

[22]     *Hall v. Add-Ventures, Ltd.*, 695 P.2d 1081, 1086 (Alaska 1985) (quoting *Mitchell v. Land*, 355 P.2d 682-685 (Alaska 1960)).

[23]     *King v. Richards*, 584 P.2d 50, 51 (Alaska 1978).

[24]     *Id.*

and intent to be bound by the offer."[25] "A greater degree of certainty is required for specific performance than for damages."[26] "[T]he party alleging an oral contract to convey land should prove the existence of the contract, its terms and [an exception to the statute of frauds] by [c]lear and convincing evidence rather than a mere preponderance of the evidence."[27]

The superior court first ruled that Glenn failed to prove the existence of fully enforceable written contracts for the sale of Lots 2, 6, and 7 under the statute of frauds and then also rejected his claims for specific performance of an oral contract because he had not adequately proven the existence of an agreement to sell. The court observed that although Alexina had executed deeds transferring Lots 4 and 5 to Glenn "without difficulty," by contrast, Alexina "specifically refused, over an extended period of time, to sign deeds for Lots 2, 6[,] and 7." Expressing doubts about Glenn's credibility, the superior court rejected his assertion that Alexina had agreed to transfer those lots to him but was unable to sign the deeds before a notary due to illness. To the contrary, the court observed that during this time Alexina executed a notarized will indicating her belief that she owned the properties in question. It therefore found that Glenn had not proven the contracts he claimed. We affirm the superior court's ruling on these points.

Glenn also claims ownership of the trailer that sits on Lots 7 and 8, relying on title documents in his name and asserting that Alexina conveyed him title to the trailer

---

[25] *Hall*, 695 P.2d at 1087 n.9.

[26] *Hollaus v. Arend*, 511 P.2d 1074, 1075 (Alaska 1973) (quoting *Rego v. Decker*, 482 P.2d 834, 838 (Alaska 1971)).

[27] *King*, 584 P.2d at 51 (first alteration in original) (quoting *Jackson v. White*, 556 P.2d 530, 534 (Alaska 1976)).

before she died.  The superior court ruled that his claim to ownership of the trailer is not at issue in this probate proceeding.[28]  We affirm the court's ruling denying Glenn's claim to the trailer on an alternative ground:  its finding that Alexina did not intend to convey the trailer to him.

> **1.      The superior court did not clearly err by finding Glenn's testimony about the land transactions not credible.**

Because the superior court's rulings turned in large part on its assessment of Glenn's credibility, we address this issue first.  The superior court found "some reason to doubt [Glenn's] credibility" in light of several pieces of evidence:  Alexina's daughter's testimony that Glenn "does not tell the truth"; Glenn's false statement on an affidavit to transfer Alexina's utilities that her estate did not have a personal representative or real property; Glenn's failure to follow a court order about a car belonging to the estate; and Glenn's actions regarding title to the Lot 7/8 trailer, which the court found "suspicious" and "dubious."  Glenn takes issue with each of these factual findings, arguing that they resulted in an erroneous negative credibility finding.

"[A]ppellate review of trial court rulings based on testimonial credibility must give 'due regard to the opportunity of the trial court to judge the credibility of the witnesses.' "[29]  A credibility finding shall not be set aside unless it is clearly erroneous, meaning "we are 'left with a definite and firm conviction that a mistake has been made

---

[28]      The superior court denied on the merits Glenn's claim of restitution based on improvements he made to the trailer.  We address this claim, along with Glenn's other restitution claims, below.

[29]      *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Dara S.*, 458 P.3d 90, 98 (Alaska 2020) (alteration in original) (quoting *Harrower v. Harrower*, 71 P.3d 854, 861 (Alaska 2003)).

after review of the entire record.' "[30]  "When reviewing factual findings we 'ordinarily will not overturn a trial court's finding based on conflicting evidence,' and will not re-weigh evidence 'when the record provides clear support for the trial court's ruling.' "[31] It "is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[32]

Glenn fails to convince us that the superior court clearly erred in its individual findings or its overall credibility determination.  First, Glenn argues that the second judge on his case "was not present at the short [May 2016] hearing on [Glenn's] claims, . . . so [she] cannot judge [Glenn's] credibility on those claims based on personal observation."  But the judge heard Glenn's testimony at the November 2017 hearing, giving her an opportunity to observe Glenn's demeanor.  It is therefore appropriate to defer to her assessment of Glenn's credibility.

Second, Glenn asserts that he incorrectly filled out the affidavit on the advice of electric company staff, not "out of malice or fraud."  The court was not required to credit his testimony on this point.  Instead the court could have reasonably found that Glenn was aware that Alexina's estate contained real property — contrary to his representation in the affidavit.  It also could have reasonably found that Glenn was aware that someone would be seeking appointment as personal representative of Alexina's estate — again contrary to his affidavit — because he had filed a demand in the estate proceeding several days earlier acknowledging the demand would be sent to

---

[30]     *Id.* (quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003)); *see also Harrower*, 71 P.3d at 861.

[31]     *Id.* (quoting *Dara S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 426 P.3d 975, 989 (Alaska 2018)).

[32]     *Dara S.*, 426 P.3d at 989 (quoting *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001)).

the personal representative when one was appointed. The court did not clearly err in relying on this evidence to find Glenn's testimony not credible.

Third, the superior court stated that Glenn had been held in contempt for his conduct regarding a car belonging to the estate. Glenn insists he was not, and on this point he may be correct because no contempt order appears in the record. But the record does show that Glenn avoided, for many months, complying with a court order to turn over the keys to the car belonging to the estate. Although Glenn testified he was unable to comply with the order because he was grievously ill, the superior court did not have to credit that testimony and could have reasonably viewed the noncompliance as evidence of Glenn's bad faith and lack of credibility.

Fourth, Glenn disputes the superior court's finding that his conduct regarding title to the trailers was "suspicious" and "dubious." The superior court stopped short of agreeing with the estate that Glenn had "fraudulently signed [Alexina's] name," but it did find the timing of Glenn's recording of title almost a year after Alexina's death and two months after the estate denied his claims "suspicious." Glenn also testified that he sought to record the transfer of title because he was scared that Alexina's daughter, as personal representative of Alexina's estate, would evict him from his home. But it was not clear error for the court to reject his explanation and find the timing suspicious.

In sum, neither the individual findings made by the superior court nor its overall credibility findings are clearly erroneous.

**2.    The superior court did not err in ruling that Glenn failed to prove that Alexina sold him the disputed lots and trailer.**

**a.    Lot 2**

To prove his claim to Lot 2, Glenn presented a check for $1,500 made out to Alexina and endorsed by her, which states "Block 2 Lot 2" in the memo line.

However, this check does not establish a contract under the statute of frauds because, as the superior court found, it "does not contain any explicit statement of their agreement."

Although extrinsic evidence may be used to show the application of terms of an alleged contract, it may not be used "to supply missing elements without which the description is hopelessly defective."[33] Price is an essential term of a contract,[34] as is the interest in land to be conveyed. The check does not state that it was payment in full or that it was made in exchange for ownership of Lot 2. In fact, according to Glenn's own testimony, he paid for Lot 2 with the check for $1,500 and $200 cash. Because the check neither mentioned an additional cash payment nor stated that it was payment in full for ownership of the lot, it was missing an essential term. Therefore, this check was not a writing sufficient to prove a contract under the statute of frauds.

Glenn argues that even if the check does not suffice to meet the statute of frauds, he is nevertheless entitled to specific performance of the agreement to purchase Lot 2 based on the full performance exception to the statute of frauds.[35] A party seeking specific performance of an oral contract for the sale of land must present clear and convincing evidence that a contract was formed with sufficiently definite terms.[36]

Glenn's evidence in support of an oral agreement to sell Lot 2 includes: his testimony regarding Alexina's agreement to sell the lot to him for $1,700; the $1,500

---

[33]    *Hall v. Add-Ventures, Ltd.*, 695 P.2d 1081, 1086 (Alaska 1985) (quoting *Mitchell v. Land*, 355 P.2d 682, 685 (Alaska 1960)).

[34]    *Brady v. State*, 965 P.2d 1, 13 (Alaska 1998) (holding that an enforceable contract did not exist "for want of an essential term — price").

[35]    AS 09.25.020(1) (providing agreement that does not satisfy statute of frauds may be enforceable if "there has been full performance on one side accepted by the other in accordance with the contract").

[36]    *King v. Richards*, 584 P.2d 50, 51 (Alaska 1978).

check endorsed by Alexina; an assessment of the property value of $2,000 at the time of sale (offered to show the amount paid is a plausible purchase price); an unsigned deed which Glenn claims was filled out, but not signed, by Alexina; and his testimony that he spent $1,700 removing cars from Lot 2, thereby investing in the property as if it were his own.

The superior court placed great weight on the unsigned deed. It found that Alexina "specifically refused, over an extended period of time, to sign deeds for Lots 2, 6[,] and 7." Glenn claims the superior court drew the wrong inference from the testimony and that Alexina did not execute the deed because she was feeling unwell on the particular day he asked her to sign. But because Alexina executed a will around the very same time that she declined to execute the deeds, we cannot say that the superior court's finding that Alexina "specifically refused" to sign the deeds is clearly erroneous. On this basis, the superior court could have reasonably disbelieved Glenn's testimony that Alexina intended to sell him the property.

Glenn argues that the superior court overlooked an assessment by the Kenai Peninsula Borough that the value of Lot 2 was $2,000, which he asserts is proof that his $1,500 check and $200 cash were tendered in exchange for the parcel. But the $2,000 figure pertains to the land alone; the property's total assessed value for land and improvements was $3,000. Further obfuscating the picture is Glenn's testimony that there were never any structures on the land and that he improved it by running over it with a bulldozer to get rid of "junk cars." The discrepancy between Glenn's asserted purchase price and the total assessed value casts doubt on the exact nature of the transaction between the parties and the investments Glenn claims he made to the property.

To enforce an oral agreement to sell, the party seeking enforcement must show by clear and convincing evidence that there was an agreement. In light of the

straightforward inference the court drew from Alexina's refusal to deed Lot 2 to Glenn and the indecisive extrinsic evidence he offered, we are not convinced that the superior court clearly erred in finding that Glenn had not shown clear and convincing evidence of a contract to purchase Lot 2.

### b. Lot 6

The only writing that suggests there may have been an agreement for Glenn to purchase Lot 6 — a deed that Alexina did not sign — cannot satisfy the statute of frauds because it is not "subscribed by the party charged."[37] There is therefore no writing memorializing the sale of Lot 6 that satisfies the statute of frauds. Glenn argues for specific performance of an oral agreement to purchase Lot 6, asserting that he "fully performed his side of the bargain . . . by making thousands of dollars of improvements to Lot 6" in exchange for title. But as with Lot 2, the superior court found that Alexina "specifically refused" to sign a deed for Lot 6, suggesting there was no contract for Glenn to purchase the property from Alexina.

It was not clear error for the superior court to find that Glenn had not shown clear and convincing evidence of a contract. Not only did the superior court find elements of Glenn's testimony not credible as a general matter, the court also appeared troubled by Glenn's inconsistent positions about what the alleged agreement for Lot 6 entailed. Glenn's original claim against the estate was that he purchased Lot 6 for $11,100. But at the hearing he claimed that Alexina agreed to convey title to him in exchange for his making roughly $7,000 in improvements to the trailer that sits on the property. These contradictory characterizations of the transaction further support the superior court's factual finding that there was no agreement for the purchase of Lot 6.

---

[37] AS 09.25.010.

### c. Lot 7

Glenn claims that he owns Lot 7. Although his brief presents this claim as an alternative to the life estate agreement he describes for Lots 7, 8, and the trailer together, his claim of ownership is better viewed as a threshold issue because he describes the sale of this parcel to him as an element of the larger plan.

The superior court ruled that the check Glenn presented as a memorandum of the sale of Lot 7 to him was not a fully enforceable contract under the statute of frauds because it did not clearly identify Lot 7 in the memo line. Although the writing indicating Lot 7 seems fairly clear to us, the rest of the writing on the memo line is not clear. Glenn asserts that it says "pmt on Lot 7 BLK 2" — a fair guess — but that is not an idiomatic way of describing payment in exchange for full ownership of something. Because the check does not clearly describe the essential terms of the agreement, it does not establish a written contract that satisfies the statute of frauds.

Glenn's alternative claim for specific performance of the asserted agreement to sell Lot 7 to him is a close call. The payment of $2,500, tendered in 2008, is for more than the property's assessed value the following year ($2,200). That is strong evidence that the check was tendered as payment in full for the property. And Glenn testified that was what the payment was for. Glenn also testified that, unlike with Lots 2 and 6, he never asked Alexina to sign a deed over to him for this lot, so the inference the superior court drew from Alexina's executing a will the day after she declined to sign deeds for those lots does not apply with the same force to Lot 7. On the other hand, the court found Glenn's testimony on certain points not credible and also gave substantial weight to Alexina's will evincing a belief that she owned Lot 7, which casts doubt on the existence of a prior agreement to sell Lot 7 to Glenn. Given our deference to the superior court's findings of fact and the high standard for proving an oral contract that warrants

specific performance under the statute of frauds, we affirm the superior court's finding that Glenn did not prove his ownership of Lot 7.

### d.    Trailer on Lots 7 and 8

Glenn claims ownership of the trailer that sits on Lots 7 and 8, relying on a title document signed by Alexina that places the trailer in his name and his testimony about substantial improvements he made to the trailer over the years.  The superior court denied Glenn's claim to ownership of the trailer.  Referring to the same evidence and inferences underlying its decision about ownership of the individual lots, the superior court explained that it "d[id] not believe [Alexina] intended to give this trailer to [Glenn]."  It referred to Alexina's will as "the most recent, written, explicit statement of her intent" with regard to her trailer and reiterated concerns with Glenn's credibility regarding their transactions.

Yet the court ultimately denied Glenn's claim to ownership of the trailer on procedural grounds.  It reasoned that his original claim against the estate "did not make a claim for the trailer" and asked only "for the addition."  So the court did not directly address ownership of the trailer and decided only Glenn's claim regarding the addition to the trailer, using principles of unjust enrichment.

The superior court's conclusion that Glenn did not make a claim for the trailer is debatable.  It is true that Glenn did not initially claim ownership of the trailer itself in his claim against the estate; he claimed only that he "paid for the addition to the trailer on Lot 8, that belongs to me."  He did not claim ownership of the whole trailer until months later, producing a title in his name and maintaining that Alexina had signed the title over to him before her death.  Such a late claim would normally be barred as

untimely.[38] But the estate also filed a motion to "quiet title" to the ownership of the trailer after Glenn registered title to the trailers with the D.M.V., and the estate appears to have never expressly raised a timeliness defense, asserting instead that Glenn forged the title documents. The superior court then expressly decided ownership of the trailer, leading to an appeal in which this court addressed Glenn's claim to the trailer and remanded to the superior court to decide this issue together with Glenn's other claims.[39] The procedural bar relied on by the superior court was never invoked by the estate, and the parties have now expended time and money disputing ownership of the trailer, so this issue is arguably at play in this appeal.

Nevertheless, we affirm the superior court's ruling on an alternative ground. A trailer is a vehicle for which title is prima facie evidence of ownership.[40] But evidence of title can be rebutted by other evidence.[41] The ultimate question is the intent of the parties.[42] Although the superior court did not acknowledge this framework, it made the

---

[38] Under AS 13.16.460, "[a]ll claims against a decedent's estate that arose before the death of the decedent . . . are barred against the estate" unless they are made "within four months after the date of the first publication of notice to creditors if notice is given in compliance with AS 13.16.450." In this matter publication compliant with AS 13.16.450 was first made on April 12, 2015, according to a notarized affidavit with a copy of the notice from a supervisor in the Peninsula Clarion. Glenn first claimed ownership of the Lot 7/8 trailer in this proceeding with his affidavit of September 22, 2015 — more than five months after notice to creditors.

[39] *In Re Estate of Rodman*, No. S-16999, 2019 WL 1976095, at *3 (Alaska May 1, 2019).

[40] AS 28.10.261; *see also* AS 28.10.661(3) (" '[V]ehicle' includes mobile homes for the purposes of provisions relating to certificates of title.").

[41] *Robertson v. Manning*, 268 P.3d 1090, 1093 (Alaska 2012).

[42] *See id.* at 1093-94 (holding that superior court "must determine the true
(continued...)

pertinent findings. It observed that Glenn had title to the trailer, yet in light of the other evidence of the parties' intent, concluded that Alexina did not intend to convey ownership of the trailer to Glenn. The superior court found the timing of Glenn's claim to ownership especially suspicious, as his initial claim against the estate did not mention ownership of the trailer or the title in his name, and he did not produce the title until months later, despite claiming Alexina had signed it over to him before her death. These findings (the same findings underlying the court's rulings on the individual lots, which we have already ruled are not clearly erroneous) suffice to deny Glenn's claim to ownership of the trailer. Therefore we affirm the superior court's order on this point.

### e. Life Estate for Lots 7 and 8, with remainder to great-grandchild

Alexina's will gave Glenn a life estate in the trailer that sits on Lots 7 and 8 and provided that upon his death these properties would be sold, with the proceeds going in equal measure to her three children and the great-grandchild. Glenn does not contest the life estate, but he claims that he and Alexina had agreed to grant themselves each a life estate in these properties, with the full remainder to the great-grandchild. In other words, according to Glenn, these properties do not belong to the estate and are not governed by the will. The superior court found that Glenn did not prove the existence of this agreement, precluding his claim for specific performance.

Glenn's evidence in support of the asserted oral agreement consists of: the endorsed check for $2,500 pertaining to Lot 7; his testimony that he spent $65,000 on improvements to the trailer and lots; several cost estimates of materials from a local hardware store totaling around $23,600, which he claims were not "much different" than

---

**42** (...continued)
intentions of the parties to fully assess" whether party claiming ownership overcame the presumption created by lack of title).

his actual spending on materials to improve the trailer; a tax assessment by the borough, which indicated that there were $2,500 in improvements in the year after Alexina's death; and the will itself, which Glenn claims "follows the parties' agreement very closely, except for the distribution of the sale proceeds."

This evidence does not convince us that the superior court clearly erred in finding that Glenn failed to show clear and convincing evidence of the agreement described. Glenn's substantial improvements to the properties do not conclusively prove his ownership. As the superior court noted, Glenn lived in the trailer and benefitted from these improvements; the improvements can be plausibly viewed as a form of rental payment for the privilege of living there instead of as investments made by an owner.

Glenn also argues that the superior court should have viewed the will itself as evidence that the alleged agreement existed because it was a similar arrangement. But the difference is significant, not only in terms of the interest left for the great-grandchild, but also because it reflects Alexina's belief that she owned the properties in question — a belief in direct conflict with Glenn's. Apart from Glenn's own testimony, which the court found not credible, there is no evidence memorializing the essential terms of a complex life estate transaction in which Glenn paid $2,500 plus tens of thousands of dollars of improvements in exchange for a life estate with remainder to the great-grandchild. Therefore the superior court did not clearly err by finding that Glenn failed to prove the existence of this agreement by clear and convincing evidence.

**D.    It Was Not Clear Error To Deny Restitution Of Payments In Cash And Kind Towards Lot 6, Lot 7, Or The Trailer, But We Remand For Additional Findings Regarding Lot 2.**

Glenn argues in the alternative that he is entitled to restitution for contributions made towards the disputed properties. "Where a party to a contract unenforceable by reason of the Statute of Frauds refuses to go on with the contract after

having received a part of the consideration from the other party, the consideration received by him may be recovered."[43] This rule "gives a right to restitution only to one who would have such a right if the contract were enforceable."[44]

There are three essential elements of a restitution claim: (1) "a benefit conferred upon the defendant by the plaintiff;" (2) "appreciation by the defendant of such benefit;" and (3) "acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof," otherwise known as unjust enrichment.[45] "Unjust enrichment does not depend on any actual contract, or any 'agreement between the parties, objective or subjective.' "[46] What is key is that "the defendant must receive a true windfall or 'something for nothing.' "[47] Additionally, "[i]t is not unjust to retain a benefit given without expectation of payment."[48]

### 1. Lots 7 and 8 and trailer

Glenn argues that because the remainder of his life estate in Lots 7 and 8 and the trailer is to be divided equally among the great-grandchild and Alexina's three children — instead of going to the great-grandchild alone — the estate "is unjustly enriched in the amount of 75% of the sale proceeds." The superior court found that there was not unjust enrichment for two reasons: first, Glenn actually received a benefit from

---

[43]     *Mitchell v. Land*, 355 P.2d 682, 687 (Alaska 1960).

[44]     RESTATEMENT (SECOND) OF CONTRACTS § 375 (AM. LAW INST. 1981).

[45]     *Alaska Sales & Serv., Inc. v. Millet*, 735 P.2d 743, 746 (Alaska 1987).

[46]     *George v. Custer*, 862 P.2d 176, 180 (Alaska 1993) (quoting *Darling v. Standard Oil Prod. Co.*, 818 P.2d 677, 697 (Alaska 1991)).

[47]     *Alaska Sales & Serv., Inc.*, 735 P.2d at 746.

[48]     *Brady v. State*, 965 P.2d 1, 14 (Alaska 1998).

his investments in these lots, and second, he never expected reimbursement. If Glenn did benefit significantly from his investment, then the estate did not receive "something for nothing" and there was no unjust enrichment.[49] Likewise, if Glenn never expected reimbursement, then it was not unjust enrichment for the estate to retain such benefit.[50]

Glenn argues that the superior court's finding that he received "much benefit from his money and labor" was clearly erroneous because it ignored "the difference in value between the agreement and the will." But a difference in value between the benefit expected and the benefit received does not alone create unjust enrichment; there must be a "true windfall" or "something for nothing."[51] The superior court did not clearly err in finding that Glenn received many benefits from the money and labor he expended on Lots 7 and 8; he will be able to live on these lots in the improved trailer for the rest of his life. And although the great-grandchild may not be entitled to the full value of the improvements, she still receives a quarter of the proceeds under Alexina's will.

Because Glenn received a genuine benefit from his contributions, the superior court did not clearly err by finding that the estate was not unjustly enriched and therefore denying Glenn's claim for restitution as to Lots 7 and 8 and the trailer.

### 2. Lot 6

Glenn argues that he is entitled to restitution for his work on Lot 6, maintaining that "there is no evidence that [Glenn] paid over $7,000 for work on Lot 6, and never expected to be paid." The superior court found that Glenn was able to store his tools in the trailer on Lot 6, so the estate was not unjustly enriched. But there is a

---

[49]   *Alaska Sales & Serv., Inc.*, 735 P.2d at 746.

[50]   *See Brady*, 965 P.2d at 14.

[51]   *Alaska Sales & Serv., Inc.*, 735 P.2d at 746.

more fundamental reason that Glenn's restitution claim fails for Lot 6: the benefit of his efforts accrued primarily to himself.

Glenn was left with title to the Lot 6 trailer.[52]  According to Glenn's testimony, all the improvements made on Lot 6 were to the trailer, not the land itself. The value of these improvements therefore accrued to Glenn.[53]  The estate was not unjustly enriched.

### 3.    Lot 2

Glenn argues that he is entitled to at least $3,400 in restitution for Lot 2, reflecting the asserted $1,700 purchase price and the $1,700 he spent clearing junked cars off the lot.  According to the superior court, Glenn had no right to restitution because he "received much benefit from his money and labor," "provided clear testimony that he never expected reimbursement," and testified that he "did everything for [the great-grandchild], and the parties', benefit."  Glenn argues that the superior court's legal

---

[52]    The superior court denied the estate's motion to quiet title to the Lot 6 trailer, and this issue was not challenged in the prior appeal. *See In re Estate of Rodman*, No. S-16999, 2019 WL 1976095, at *2-3 (Alaska May 1, 2019).

[53]    Glenn testified that the Lot 6 trailer was later severely damaged by one of Alexina's children, perhaps to suggest that he would not receive the full benefit of his investments in the trailer even if he now has title.  But he cannot make a claim against the estate in this probate proceeding for what essentially amounts to the tort of conversion by a third party. *See K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 717 (Alaska 2003) ("The tort of conversion is 'an intentional exercise of dominion and control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.' " (quoting *Carver v. Quality Inspection & Testing, Inc.*, 946 P.2d 450, 456 (Alaska 1997))).  Glenn believed that Lot 6 was his, so if he wished to pursue legal action against one of Alexina's children for damage to the trailer, he could have done so in a different proceeding.

conclusions regarding restitution for Lot 2 were erroneously based upon factual findings for Lots 7 and 8 and the trailer on these lots.

Glenn's argument that the superior court erroneously lumped his claims together has merit. The superior court did not identify any benefit he received for his contributions to Lot 2. There was no evidence that the improvements on Lot 2 were intended to benefit the great-grandchild, so Glenn's testimony that he never expected reimbursement for improvements to Lots 7 and 8 does not necessarily apply to Lot 2. Thus, the superior court's finding that the estate was not unjustly enriched with regard to Lot 2 appears to relate almost entirely to evidence pertaining to the other lots. With no finding that Glenn received any benefit for his payments towards and labor on Lot 2 and no express finding that Glenn's monetary and in-kind contributions toward Lot 2 were connected with the life-estate arrangement for Lots 7 and 8 and the trailer, it is not possible to decide whether the estate got "something for nothing" by keeping the benefit of Glenn's contributions.

Although unjust enrichment is generally a question of fact,[54] the superior court commits legal error if it "fail[s] to make factual findings appropriate to the relevant legal test."[55] Without a finding on whether Glenn received anything for his contributions

---

[54]    *State, Dep't of Revenue, Child Support Enf't Div. v. Wetherelt*, 931 P.2d 383, 390 n.11 (Alaska 1997).

[55]    *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp.*, 129 P.3d 905, 916 (Alaska 2006).

toward Lot 2, it is not possible to determine whether the estate was unjustly enriched.[56] We therefore remand for relevant findings on this issue.

## V.     CONCLUSION

We REVERSE and REMAND solely on the issue of restitution for Lot 2, but AFFIRM the judgment of the superior court in all other respects.

---

[56]     *See Alaska Sales & Serv., Inc.*, 735 P.2d at 746 ("A person is enriched if he receives a benefit; a person is unjustly enriched if the retention of the benefit without paying for it would be unjust." (quoting *Bevins v. Peoples Bank & Tr.*, 671 P.2d 875, 881 (Alaska 1983)).